In the Supreme Court of Georgia

Decided: March 25, 2016

S15A1734. PYATT v. THE STATE.

BLACKWELL, Justice.

Tremaine Pyatt was tried by a Muscogee County jury and convicted of felony murder and two aggravated assaults, all in connection with a shooting in which Meredith "Tag" Rhodes was fatally wounded. Pyatt appeals, contending that the evidence is insufficient to sustain his convictions, that the trial court erred when it admitted certain evidence, that the trial judge made an improper comment in the presence of the jury, that the trial court erred when it charged the jury, that he was denied a trial before a fair and impartial judge, and that he was denied the effective assistance of counsel. We affirm.[1]

---

[1] The shooting occurred on June 17, 2007. Pyatt was indicted on December 18, 2007, and he was charged with malice murder, felony murder, and three aggravated assaults (against Rhodes and two other persons). Pyatt was tried in August 2009, and the jury returned its verdict on August 6, acquitting Pyatt of malice murder and finding him guilty on all other counts. Pyatt was sentenced to imprisonment for life for felony murder and concurrent terms of imprisonment for twenty years for each of the aggravated assaults. Pyatt filed a timely motion for new trial on August 17, 2009, which he amended five times over the next five years. On April 7, 2015, the trial court granted the motion in part, vacating his sentence for aggravated assault upon Rhodes and merging that aggravated assault with the felony murder.

1. Viewed in the light most favorable to the verdict, the evidence shows that Rhodes and three friends — Marcus Jackson, Fitzgerald Nash, and Reginald Goodwin — decided on the evening of June 16, 2007 to visit some nightclubs in the Columbus area. At first, they drove to the VIP Lounge,[2] only to find that establishment already crowded. In the vicinity of the VIP Lounge, however, the men encountered Saletta Perry and Breana Broadnax, who asked for a ride. Rhodes agreed, and the two young women joined Rhodes in his car. Rhodes, his friends, and the two young women then proceeded to the Rogers Tap Room.

Rhodes parked his car in the front of the Rogers Tap Room. In the parking lot, Rhodes and his friends struck up a conversation with another group of women. Meanwhile, Perry and Broadnax waited near Rhodes's car. At some point, Pyatt and his friends emerged from the Rogers Tap Room. Pyatt and Perry previously had been in a romantic relationship, and when they came across one another in the parking lot, they began to argue. Rhodes got into his car to leave

The trial court otherwise denied the motion for new trial. Pyatt timely filed a notice of appeal on April 10, 2015. His appeal was docketed in this Court for the September 2015 term and submitted for decision on the briefs.

[2] Rhodes drove his own car, and he was accompanied by Jackson. Nash drove another vehicle, and Goodwin rode with Nash.

the Rogers Tap Room, and Perry and Broadnax joined him. As Rhodes drove out of the parking lot, Perry and Broadnax leaned out of the open windows of his car and continued the argument with Pyatt, shouting at him. Pyatt shouted back, and he fired a handgun in the direction of the car.[3] One of Pyatt's friends recognized Rhodes and said that, if Rhodes returned, he would shoot Rhodes. In that case, Pyatt responded, "I'm shooting."

Rhodes, Perry, and Broadnax drove away, but Rhodes eventually turned his car around. Rhodes and the young women then returned to the Rogers Tap Room, and as they drove by the nightclub, several more gunshots were fired. These gunshots frightened Perry and Broadnax, and at that point, they exited the car. Now driving alone, Rhodes turned his car around again and drove past the nightclub once more. As he did, he spoke by phone with Jackson, who warned Rhodes that several people were "coming after [him]." Pyatt and several other men were standing along the street, and the group fired multiple shots at Rhodes as he passed by the nightclub for the last time. Rhodes was wounded, and he crashed his car into a parked vehicle. Jackson found Rhodes, pulled him from

---

[3] Much of the eyewitness testimony in this case conflicted, including on this point. Some witnesses said that Pyatt only fired a shot into the air.

the car, and put him into Nash's vehicle. Nash, Jackson, and Goodwin then attempted to drive Rhodes to a hospital, but they wrecked along the way. Rhodes later died of a gunshot wound to his neck, which had left his spinal cord severed.

In the meantime, Pyatt and Joseph Taylor left the Rogers Tap Room for another nightclub. As they drove, Pyatt was speaking by phone with someone. In the course of his conversation, Pyatt asked: "[W]hy are you telling me? I wasn't the only one shooting."[4] At the scene of the shooting, investigators later found cartridge casings ejected from at least three different handguns. One of those casings was consistent with the projectile that fatally wounded Rhodes.

Noting that no eyewitness could say who fired the shot that fatally wounded Rhodes, Pyatt claims that the evidence is insufficient to sustain his convictions. When we consider whether the evidence is legally sufficient, however, we must view it in the light most favorable to the verdict. See Bryant v. State, 296 Ga. 456, 457 (1) (769 SE2d 57) (2015). So viewed, the evidence in this case shows that Pyatt was engaged in an angry dispute with Perry, who

---

[4] Again, the evidence of exactly what Pyatt said is conflicting.

was accompanying Rhodes. As Rhodes, Perry, and Broadnax drove away from the Rogers Tap Room for the first time, Pyatt fired a shot in their direction. Pyatt then said that, if Rhodes returned, he would shoot again. When Rhodes and the two young women returned, several additional gunshots were fired. And when Rhodes drove past the nightclub for the last time, Pyatt was among a group that fired at least three handguns, one of which fatally wounded Rhodes. The State was not required to prove that Pyatt himself fired the fatal shot, so long as it proved that he was a party to the fatal shooting. See OCGA § 16-2-20.[5] And the State properly could carry its burden of proof by circumstantial evidence, so long as the circumstantial evidence was sufficient to exclude every hypothesis

---

[5] OCGA § 16-2-20 provides:
   (a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.
   (b) A person is concerned in the commission of a crime only if he:
      (1) Directly commits the crime;
      (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;
      (3) Intentionally aids or abets in the commission of the crime; or
      (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

5

other than his guilt. See former OCGA § 24-4-6.[6] Viewing the evidence in the light most favorable to the verdict, we conclude that it was sufficient to permit a rational jury to find beyond a reasonable doubt that Pyatt was guilty of the crimes of which he was convicted, whether as a principal or only an accomplice. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Detective Robert Jackson investigated the shooting, and he testified as a witness for the State at trial. In the course of his testimony, Detective Jackson twice made comments that, according to Pyatt, amounted to improper opinions on ultimate issues in the case. Pyatt claims that the trial court erred when it

---

[6] This case was tried in 2009, and so, it was tried under our old Evidence Code. At the time of trial, former OCGA § 24-4-6 provided that, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." This provision of former OCGA § 24-4-6 was carried forward into the new Evidence Code, and it now can be found at OCGA § 24-14-6. Applying this provision, we have explained:

> [N]ot every hypothesis is a reasonable one, and the evidence need not exclude every conceivable inference or hypothesis — only those that are reasonable. Whether an alternative hypothesis raised by the defendant is reasonable is a question committed principally to the jury, and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law.

Black v. State, 296 Ga. 658, 660 (1) (769 SE2d 898) (2015) (punctuation, citations, and emphasis omitted).

allowed those comments. See Fordham v. State, 254 Ga. 59, 59-60 (4) (325 SE2d 755) (1985). Pyatt, however, did not object to the testimony about which he now complains, and for that reason, this claim of error is not preserved for appellate review.[7] See Colton v. State, 292 Ga. 509, 513 (3), n.2 (739 SE2d 380) (2013); Sanchez v. State, 285 Ga. 749, 751-752 (3) (684 SE2d 251) (2009).

3. Pyatt also complains that the trial judge made an improper comment in the presence of the jury. As Detective Jackson was testifying, the prosecuting attorney asked him to read aloud a written statement that Joseph Taylor had given to investigators. Taylor had testified earlier, and Pyatt objected that the jury already had heard about his statement and that it was unnecessary for Detective Jackson to go through the statement again. The judge discussed the

---

[7] Even when no timely objection is made in the trial court, our new Evidence Code permits appellate review of evidentiary rulings for plain error. See OCGA § 24-1-103 (d) (court may "tak[e] notice of plain errors affecting substantial rights although such errors were not brought to the attention of the [trial] court"). See also Gates v. State, 298 Ga. 324, 326-327 (3) (781 SE2d 772) (2016). But as we have noted, see note 6, supra, this case was tried in 2009 under the old Evidence Code. Although " an appellate court [typically] applies the law as it exists at the time its opinion is rendered," Elmore v. State, 269 Ga. 528, 529 (4) (501 SE2d 215) (1998) (citation omitted), the new Evidence Code explicitly applies only to "any motion made or hearing or trial commenced on or after [January 1, 2013]." Ga. L. 2011, p. 99, § 101. The new Evidence Code does not apply in this case, and in the absence of a timely objection, there is no appellate review of evidentiary rulings under the old Evidence Code in a case like this one. See Durham v. State, 292 Ga. 239, 240 (2) (734 SE2d 377) (2012).

objection with the lawyers, and in the middle of their extended colloquy, the

judge appears to have agreed with the prosecuting attorney that the statement

was "critical evidence."[8] It is that comment with which Pyatt now takes issue.

---

[8] The colloquy went as follows:

[Prosecuting attorney]: All right, sir. All right, sir. Would you please read Mr. Taylor's statement?

[Detective Jackson]: Beginning to end? [Detective Jackson begins to read from the statement.]

[Defense counsel]: Your Honor, why would we be reading this again? We've already had Joseph Taylor testify and we've gone over the statement with him on his testimony. Seems like we're violating the rule about the continuing witness here in court.

[The Court]: I don't think it's a continuing witness violation, but how — you've had the man here and covered the statement with him. Are you trying to go back and do it again?

[Prosecuting attorney]: Well, I mean, *this is the critical statement, critical evidence, Judge.*

[The Court]: *It is.* But it's admitted on some basis. Now, the witness Taylor was examined about this at great length, the statement he gave. And you covered the statement at that time. I think [defense counsel] is right for the wrong reason.

[Prosecuting attorney]: So you are not permitting us to read the statement?

[The Court]: That's correct. Do you have any thoughts that you can bring to my mind as to why it would be admissible? I can't think of one[.]

[Prosecuting attorney]: Well, I just believe his prior statements are admissible. And we rolled the videotape verbatim from start to finish[,] and I would just like to do that statement verbatim from start to finish so the jury will have the benefit of all those statements as well as his live testimony.

[The Court]: What you have just said is you want to sustain your witness with this. Is there a significant difference between the — wasn't there a videotape of him taken with [Taylor's lawyer] present?

[Prosecuting attorney]: The two videotapes [depict statements given when Taylor's lawyer was not present]. Whereas, [the lawyer] was present during the written statement that he signed in February [2008]. I believe we

Pyatt relies on former OCGA § 17-8-57, which forbid a trial judge in the presence of the jury to "express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused." Assuming that the comment in question even implicates former OCGA § 17-8-57,[9] we

---

have a right to go into prior inconsistent statements as well as prior consistent statements. And his motivation has been called into question because of so-called plea deals and everything else. So I believe, I believe we're entitled to go into it.

[The Court]: [Defense counsel], since I've reasoned on it[,] if it's offered to sustain the witness would it not be admissible? If not, why not?

[Defense counsel]: Your Honor, if there's some point. But the point is we've already gone over that statement. And, in fact, just about read the whole statement in the record one time. . . . .

[The Court]: To tell you the truth, y'all have worn me out to the point I don't have a good recollection.

[Defense counsel]: Well, Your Honor —

[The Court]: Hold on. Hold on. This is what I'm going to do. While we're sitting here doing all this law stuff and [the jurors] are sitting there wondering what the heck is going on[,] I'm going to allow [the jury] a recess. . . .

(Emphasis added). At that point, the trial judge sent the jury out, and after additional discussion of the objection, Pyatt withdrew his objection. The judge then gave a break to the attorneys, and when the trial eventually resumed, Detective Jackson read Taylor's statement.

[9] To begin, we note that Pyatt failed to object to the comment in question. Under former OCGA § 17-8-57, the absence of an objection did not limit appellate review, and so, the failure to object in this case would be inconsequential. See Ledford v. State, 289 Ga. 70, 84-85 (14) (709 SE2d 239) (2011). See also Rouse v. State, 296 Ga. 213, 234-238 (765 SE2d 879) (2014) (Nahmias, J., dissenting). In 2015, however, the General Assembly amended the statute and added a provision that limits the scope of appellate review in cases in which no timely objection was made at trial. See OCGA § 17-8-57 (b). Today, in the absence of a timely objection, a judicial comment — other than a comment on the guilt of the accused, see OCGA § 17-8-57 (c) — amounts to reversible error under the statute only to the extent that it is "[a] plain error which affects substantial rights." OCGA § 17-8-57 (b). Unlike the new

9

Evidence Code, see note 7, supra, the 2015 amendment of OCGA § 17-8-57 is not limited expressly to cases tried on or after its effective date. See Ga. L. 2015, p. 1050. And as we have noted, unless the statutory law indicates otherwise, "an appellate court [typically] applies the law as it exists at the time its opinion is rendered." Elmore v. State, 269 Ga. 528, 529 (4) (501 SE2d 215) (1998) (citation omitted). This is especially true of law that is only procedural in nature. See Polito v. Holland, 258 Ga. 54, 55 (2) (365 SE2d 273) (1988) ("[W]here a statute governs only procedure of the courts, including the rules of evidence, it is to be given retroactive effect absent an expressed contrary intention." (Citations omitted)). See also Deal v. Coleman, 294 Ga. 170, 175 (1) (b), n.12 (751 SE2d 337) (2013). And the provision of the 2015 amendment with which we are concerned — OCGA § 17-8-57 (b) — applies not to proceedings in the trial court, which, in this case, predated the amendment. Rather, that provision is specifically directed to appellate review. The appeal in this case, of course, followed the amendment. See Landgraf v. USI Film Products, 511 U. S. 244, 291 (114 SCt 1522, 128 LE2d 229) (1994) (Scalia, J., concurring) ("The critical issue . . . is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs *after* the effective date of the statute is covered. Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event. A new rule of evidence governing expert testimony, for example, is aimed at regulating the conduct of trial, and the event relevant to retroactivity of the rule is the introduction of testimony. Even though it is a procedural rule, it would unquestionably not be applied to *testimony already taken* . . . ." (Emphasis in original)). See also United States v. Nunemacher, 362 F3d 682, 686 (10th Cir. 2004) (new standard of appellate review applied, notwithstanding that it was adopted after the proceedings in the trial court were concluded); United States v. Mallon, 345 F3d 943, 946 (7th Cir. 2003) (same). But because there is no reversible error in this case even under the former version of the statute, we need not decide whether the 2015 amendment properly applies. Instead, we will assume — without deciding — that former OCGA § 17-8-57 applies.

We also note that, by his agreement that Taylor's statement was "critical evidence," the judge did not express or intimate anything about the guilt of the accused. And in a sense, the judge also did not express or intimate anything about "what ha[d] or ha[d] not been proved." A statement, after all, is evidence offered to prove facts, and proof of a fact is not the fact itself. Significantly, the judge in this case did not comment on the credibility of Taylor's statement or what, if anything, the statement proved. Accordingly, there is some reason to doubt that the comment in question even implicates former OCGA § 17-8-57. Nevertheless, we find some authority for the proposition that former OCGA § 17-8-57 applies to such a comment. See Carruth v. State, 286 Ga. App. 431, 434-435 (3) (649 SE2d

conclude that it did not violate the statute. The judge made the comment in an extended colloquy with counsel, as the judge was explaining his thinking about Pyatt's objection to Detective Jackson reading the Taylor statement. As we have explained before, former OCGA § 17-8-57 "does not generally extend to colloquies between the judge and counsel regarding the admissibility of evidence. Furthermore, we have previously determined that remarks of a judge assigning a reason for his ruling are neither an expression of opinion nor a comment on the evidence." Ellis v. State, 292 Ga. 276, 282 (3) (736 SE2d 412) (2013) (citations omitted). See also Ridley v. State, 290 Ga. 798, 800 (2) (725 SE2d 223) (2012). Moreover, in discussing the admissibility question with counsel, the judge "never expressed any opinion about the veracity of the evidence itself. In any case, when the colloquy is considered as a whole, it is clear that the trial court was leaving it up to the jury to decide what the evidence did or did not show." Ford v. State, ___ Ga. ___, ___ (5) (Case No. S15A1626, decided March 7, 2016). Although it might have been better for the judge to have avoided any agreement with the notion that Taylor's statement was

557) (2007) (addressing judicial comment that allegedly violated OCGA § 17-8-57 by highlighting the significance of certain testimony). Accordingly, we again will assume — without deciding — that the comment in question implicates the statute.

11

"critical evidence," "the judge's comment here in no way constituted the type of direct comment on the substance or weight of the evidence that we have held to violate [former] OCGA § 17-8-57." Dailey v. State, 297 Ga. 442, 443 (2) (774 SE2d 672) (2015) (citation omitted). The comment did not violate former OCGA § 17-8-57.

4. Pyatt contends that the trial court erred when it charged the jury on the law concerning conspiracy and parties to a crime. According to Pyatt, these charges were not warranted because the indictment did not allege a conspiracy or that he was an accomplice, and there was no evidence to support the charges, he says, in any event. We disagree. It is not error "for the trial court to charge the jury on the law of conspiracy when the evidence introduced at trial supports the instruction, even when the defendant is not indicted for conspiracy." Hayes v. State, 298 Ga. 98, 100 (2) (a) (779 SE2d 609) (2015). Likewise, a charge on parties to a crime may be permissible, notwithstanding that the defendant was not indicted as an accomplice. See Mann v. State, 297 Ga. 107, 108 (2) (772 SE2d 665) (2015). And slight, circumstantial evidence can form a proper evidentiary foundation for both charges. See Bragg v. State, 295 Ga. 676, 678 (3) (763 SE2d 476) (2014); Williams v. State, 267 Ga. 308, 309 (2) (477 SE2d

12

570) (1996). In this case, both charges were authorized, inasmuch as the evidence showed that Pyatt was a part of a group that ambushed Rhodes and fired the fatal shot, after Pyatt and another had expressed their mutual intention to shoot at Rhodes if he returned to the Rogers Tap Room. See Bragg, 295 Ga. at 678 (3); Williams, 267 Ga. at 309 (2).

5. Contending that the trial judge was partial to the State, Pyatt claims that he was denied a trial before a fair and impartial judge. The record shows, however, that Pyatt at the time of trial was aware of the circumstances that, he says on appeal, evidence the partiality of the judge. Even so, Pyatt filed no motion to recuse the trial judge. Generally speaking, "[w]hen a party learns of grounds for the potential disqualification of the judge, he must promptly move for the recusal of the judge, and if he does not, the question of disqualification is not preserved for appellate review." State v. Hargis, 294 Ga. 818, 821 (1) (756 SE2d 529) (2014) (citations and footnote omitted). See also Battle v. State, ___ Ga. ___, ___ (2) (a) (Case No. S15A1510, decided March 21, 2016); Woodall v. State, 294 Ga. 624, 633 (9) (754 SE2d 335) (2014); In re Adams, 292 Ga. 617, 617 (1) (740 SE2d 134) (2013). "Even after [Pyatt] learned of the grounds for the potential disqualification of the trial judge, he apparently decided to take

13

his chances with the same judge . . . . That was his choice to make, but he could not do so and still preserve the disqualification issue for review in the appellate courts." Hargis, 294 Ga. at 822 (1) (footnote omitted). As we have explained,

> [t]o hold otherwise would be to sanction gamesmanship. Moreover, the requirement that a motion to recuse be filed promptly is intended to promote judicial economy, that is, to ensure that "long and costly proceedings" before a disqualified judge are avoided. The idea that a party could allow a judge whom the party believes to be disqualified to continue to preside over the case without objection, only later to urge the disqualification, is inconsistent with the principles of fair play and judicial economy that are embodied in the requirement that a motion to recuse be filed promptly.

Id. at 822-823 (1) (citations and punctuation omitted). See also Battle, ___ Ga. at ___ (2) (a); GeorgiaCarry.org, Inc. v. James, ___ Ga. ___, ___ (1) (Case No. S15A1901, decided Feb. 1, 2016). Under our precedents, Pyatt has failed to preserve any claim of error about the partiality of the trial judge for appellate review.

In an effort to escape this conclusion, Pyatt urges that this is no ordinary case. Here, he says, the bias of the trial judge was so profound and pervasive that it worked a denial of his constitutional right to due process, and Pyatt contends that such a denial can be reviewed on appeal, even in the absence of a timely motion to recuse the trial judge. Our precedents, however, do not

14

recognize such a distinction. And although the denial of a trial before a fair and impartial judge in violation of the constitutional guarantee of due process may amount to a "structural error," even structural errors are capable of forfeiture. See United States v. Christi, 682 F3d 138, 142-143 (1st Cir. 2012) (Souter, J.). See also Johnson v. United States, 520 U. S. 461, 466 (I) (117 SCt 1544, 137 LE2d 718) (1997) (even a "structural error" is subject to plain error review under Federal Rule of Criminal Procedure 30 in the absence of a timely objection).

Even assuming that bias on the part of a trial judge so profound and pervasive as to implicate the constitutional guarantee of due process need not be raised in the trial court by way of a timely motion to recuse, this case presents no such bias. As evidence of bias, Pyatt relies principally on a discussion in chambers, in which the trial judge gave some advice about trial strategy to the prosecuting attorney. When the trial began, the prosecuting attorney apparently had it in mind to convince the jury that Pyatt was the principal with respect to the murder — that is, that Pyatt himself fired the fatal shot. As the evidence was presented, however, it became apparent that there was some uncertainty about the identity of the person who fired the fatal shot. At some point in the trial, the

15

judge retired to chambers and met with the prosecuting attorney and defense counsel. There, the judge suggested that the prosecution would be better off arguing simply that Pyatt was a party to the murder, whether as a principal or accomplice.[10]

A trial judge generally ought not give advice to a lawyer about trial strategy in a case in which the judge is presiding. At least in some circumstances, the giving of such advice could create an appearance of partiality, which is a proper ground for a motion to recuse under our Code of Judicial Conduct. See Code of Judicial Conduct, Rule 2.11 (A) ("Judges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned . . . .").[11] And for the purposes of this appeal, we will assume — without deciding — that the conversation in chambers created such an appearance of partiality. But not every violation of the Code of Judicial

[10] Precisely when this meeting occurred, and exactly what was said, is not reflected in the record. But it appears undisputed that the meeting occurred after the trial was underway and that the judge suggested to the prosecuting attorney that he pursue a theory that Pyatt was a party to the murder, rather than focusing on evidence that Pyatt was the principal.

[11] As of January 1, 2016, this Court adopted a new Code of Judicial Conduct, and that new Code is cited in the text above. Our former Code of Judicial Conduct — which was in effect at the time of trial in this case — similarly provided, however, that "[j]udges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned . . . ." Former Code of Judicial Conduct, Canon 3 (E) (1).

16

Conduct implicates the constitutional guarantee of due process. As the United States Supreme Court has explained, "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications," Aetna Life Ins. Co. v. Lavoie, 475 U. S. 813, 828 (III) (106 SCt 1580, 89 LE2d 823) (1986), and generally speaking, "the codes of judicial conduct provide more protection than due process requires." Caperton v. A.T. Massey Coal Co., 556 U. S. 868, 890 (IV) (129 SCt 2252, 173 LE2d 1208) (2009). Accordingly, the constitutional standard for judicial disqualification is "confined to rare instances." Id. See also Federal Trade Commission v. Cement Institute, 333 U. S. 683, 702 (68 SCt 793, 92 LE 1010) (1948) ("[M]ost matters relating to judicial disqualification d[o] not rise to a constitutional level." (Citation omitted)).

Unlike our Code of Judicial Conduct, the constitutional guarantee of due process is not concerned with mere appearances of partiality. To the contrary, due process is concerned with *actual* bias, see Caperton, 556 U. S. at 883 (III), and absent a showing of actual bias, due process requires recusal only in particular circumstances in which "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Id. at 872 (citation and punctuation omitted). For instance, due process may require

17

recusal when a judge has a direct pecuniary interest in the outcome of a case, see Tumey v. Ohio, 273 U. S. 510, 535 (47 SCt 437, 71 LE 749) (1927), when a judge has an indirect, but substantial, pecuniary interest in the outcome, see Lavoie, 475 U. S. at 823-824 (III) (B), when a judge has executive responsibilities for the finances of an organization with a direct pecuniary interest in the outcome, see Ward v. Monroeville, 409 U. S. 57, 60 (93 SCt 80, 34 LE2d 267) (1972), when "a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," Caperton, 556 U. S. at 884 (III), when a judge personally was responsible for the bringing of the charges to be tried, see In re Murchison, 349 U. S. 133, 137 (75 SCt 623, 99 LE 942) (1955), and when a judge has been so personally "vilified" by a party charged with contempt as to "necessarily become[] embroiled in a running, bitter controversy" with the contemnor. Mayberry v. Pennsylvania, 400 U. S. 455, 465 (91 SCt 499, 27 LE2d 532) (1971). The record in this case, however, discloses no actual bias[12] and involves

---

[12] No doubt, the "coaching" of the prosecution by the trial judge in this case *might* be indicative of an actual bias in favor of the State. But it is not inevitably and necessarily indicative of such bias. In the first place, we note that the "coaching" in question occurred

18

no circumstance that has been recognized as presenting an intolerably high

probability of actual bias. The law presumes "honesty and integrity [on the part

_____

not in secret, but in a meeting between the trial judge, the prosecuting attorney, and *defense counsel*. Second, the record does not disclose exactly what was said or the context in which it was said, which makes it difficult, if not impossible, to assign actual bias as the motivation for the so-called "coaching." Third, although a trial judge ordinarily ought not "coach" a lawyer on trial strategy, a trial judge is legitimately concerned in promoting an efficient and clear presentation of the case to the jury. When a judge sees a lawyer presenting his case in a way that seems to be wasting the time of the jury or confusing the jurors, we are aware of no absolute rule against the judge saying something to the lawyer, although the judge must take care not to do so by way of an impermissible ex parte conversation. Even a well-meaning judge, we suppose, might inadvertently cross the line between promoting an efficient and clear presentation of the issues and "coaching" a lawyer about strategy. Cf. Scott v. Rosenthal, 2001 U.S. Dist. LEXIS 12803, *21 (S.D.N.Y. 2001) (alleged "coaching" of party was done to promote "a fair presentation of evidence" and did not, therefore, indicate a bias); State v. Melde, 2014 Minn. App. Unpub. LEXIS 746, *13-14 (Minn. App. 2014) (alleged "coaching" of prosecuting attorney in closing argument was attributable to a legitimate effort "to clarify the evidence in the record"). Finally, the "coaching" in this case might well be as indicative of judicial frustration with the prosecuting attorney as of a bias in favor of the State. Indeed, Pyatt's trial lawyer testified at the hearing on the motion for new trial about the "coaching" of the prosecution, and his testimony hints at tension between the trial judge and prosecuting attorney. Cf. People v. Cardenas, 2005 Cal. App. Unpub. LEXIS 1068, *11-12 (Ct. App. 2005) ("It is unlikely any trial court comments or coaching suggested a prosecutorial bias. If anything, the trial court's comments highlighted its frustration and impatience with the prosecution."). Without something more, we are unwilling to find actual bias solely on the basis of the sort of "coaching" that apparently occurred in this case. That said, we do not condone any judge "coaching" a lawyer about trial strategy in a case to be tried before the judge.

Pyatt argues that there is something more in this case, but we do not see it. Pyatt points to the judge instructing deputies to return a witness to jail, for instance, but the witness was, in fact, to be returned to jail, and the jury already knew that the witness had been in jail. Pyatt notes that the judge formerly had served as the district attorney. But prior service as a prosecuting attorney is not a circumstance that forever disqualifies a judge from sitting in criminal cases. Finally, Pyatt makes a number of additional allegations about the trial judge, but those allegations are not established by the record in this case.

19

of] those serving as adjudicators," <u>Withrow v. Larkin</u>, 421 U. S. 35, 47 (III) (95 SCt 1456, 43 LE2d 712) (1975), and Pyatt has failed to overcome the presumption in this case. His claim that he was denied a trial before a fair and impartial judge in violation of the constitutional guarantee of due process is without merit.

6. Finally, Pyatt contends that he was denied the effective assistance of counsel at trial. To prevail on a claim of ineffective assistance, Pyatt must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, Pyatt must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also <u>Kimmelman v. Morrison</u>, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, Pyatt must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome." <u>Strickland</u>, 466 U. S. at 694 (III) (B). See also <u>Williams v. Taylor</u>, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden is a heavy one, see <u>Kimmelman</u>, 477 U. S. at 382 (II) (C), and we conclude that Pyatt has failed to carry it.

(a) Pyatt contends that his lawyer was ineffective in three respects, but we can dispose of two with little discussion. First, he says, his lawyer was ineffective because he failed to "object" on due process grounds to the trial judge "coaching" the prosecuting attorney. But as we have explained, see Division 5, supra, the so-called "coaching" does not establish actual bias on the part of the trial judge, and it does not, therefore, implicate the constitutional guarantee of due process. Any "objection" on due process grounds would have been without merit, and the failure to make an objection without merit does not amount to ineffective assistance. See <u>Bradley v. State</u>, 292 Ga. 607, 614 (5) (740 SE2d 100) (2013). Second, Pyatt claims, his lawyer was ineffective because he failed to interpose an "ultimate issue" objection when Detective Jackson testified that Travoris Born — who had been a person of interest to investigators early in the investigation of the killing of Rhodes — had been "a hundred percent cleared." But that testimony would not properly have been objectionable

21

on "ultimate issue" grounds precisely because the culpability of Born (or lack thereof) was not an issue for the jury to decide in this case. See Lamar v. State, 297 Ga. 89, 92-93 (3) (772 SE2d 636) (2015). We turn, therefore, to the third ground for the claim of ineffective assistance.

(b) Pyatt also contends that his lawyer was ineffective because he failed to object on "ultimate issue" grounds when Detective Jackson testified that, in his opinion, the shot fired by Pyatt as Rhodes drove away from the Rogers Tap Room for the first time was an aggravated assault. On direct examination, Detective Jackson testified at length about his investigation, and he testified that, in the course of his investigation, he had obtained a warrant for the arrest of Pyatt for aggravated assault. He then testified as follows:

> Q. And you spoke to a number of witnesses, correct?
> A. Yes, sir, quite a few. And there were a lot we couldn't find. A lot of people don't want to get involved when something like this happens. They either hide out or we just can't find them. That's still true to this day on this case and many others.
> Q. I'm sorry. I can't hear you?
> A. I said that's still true to this day that we can't find these people on this case and many others. People just don't want to get involved sometimes. But the initial aggravated assault warrant was based on the car being fired at. There has been some comments made [about] a warning shot by [defense counsel] and yourself, you picked up on. At no time did I ever consider this a warning shot. The initial round was fired, according to witnesses, in the direction

22

of the car[,] over the car. Now, I'm not going to get into inches or feet but I don't know. I wasn't there. But I can tell you according, including his own aunt, that it was fired toward the car. *In my opinion and in what I consider the law[,] that is aggravated assault.* That's why he was charged with three counts of aggravated assault.

Q. For the shot towards the car?

A. The first shot, yes, sir.

Q. First shot with [Broadnax], [Perry], and [Rhodes] in the car?

A. That is correct. I never considered it a warning shot. *That was an assault.*

(Emphasis supplied).

Under our old Evidence Code, it was settled that "a witness [ordinarily] may not express his opinion as to an ultimate fact, because to do so would invade the province of the jury."[13] Fordham, 254 Ga. at 59 (4) (citation omitted). For the purposes of this appeal, we will assume — without deciding — that the testimony at issue properly was objectionable on "ultimate issue" grounds. We also will assume — again, without deciding — that the failure to raise such an objection was unreasonable.[14] Even so, Pyatt still must show that the failure to

---

[13] Opinions on ultimate issues are addressed in the new Evidence Code at OCGA § 24-7-704.

[14] In some circumstances, it may be reasonable trial strategy to forgo an objection to testimony that amounts to an opinion on the ultimate issue. See, e.g., Walker v. State, 329 Ga. App. 369, 376 (3) (d) (765 SE2d 599) (2014). In this case, at the hearing on the motion

23

object was prejudicial. See Fulton v. State, 278 Ga. 58, 63 (8) (597 SE2d 396) (2004). We conclude that Pyatt has failed to make that showing.

To begin, we note that the jury already knew that Detective Jackson had sought and obtained a warrant for the arrest of Pyatt for aggravated assault. That Detective Jackson subjectively believed that Pyatt had committed aggravated assault was, therefore, patently obvious. Although it may have been improper for Detective Jackson to share his subjective belief with the jury explicitly, any rational juror would have guessed that Detective Jackson believed as much without being told. As we have explained before, "[s]uch comments upon the patently obvious generally pose little, if any, danger of prejudice." Butler v. State, 292 Ga. 400, 407 (3) (a) (738 SE2d 74) (2013). We note as well that Detective Jackson testified only as a lay witness, and so, we need not worry that any improper opinion about the ultimate issue was bolstered by the designation

---

for new trial — nearly five years after the trial itself — Pyatt's trial counsel testified that he had no strategic reason to forgo an objection. But the best evidence of trial strategy is the trial transcript itself, which establishes definitively what trial counsel did and did not do at trial. Here, the transcript shows that trial counsel used the testimony in question as the basis for a line of cross-examination in which counsel suggested that Detective Jackson had misunderstood a number of the witnesses. Such cross-examination, of course, furnishes a strategic reason to forgo an objection. See Vanstavern v. State, 293 Ga. 123, 126-127 (3) (c) (744 SE2d 42) (2013). Nevertheless, we will assume for the purposes of this appeal that the failure to object was not a part of a reasonable strategy.

of the witness as an expert.[15] Cf. <u>Williams v. State</u>, 254 Ga. 508, 510-511 (2)

(330 SE2d 353) (1985). Moreover, this is not a case in which an improper

opinion about the ultimate issue would have confused or misled the jury about

the law to the prejudice of the defendant.[16] Detective Jackson specified clearly

that he believed the initial shot was an aggravated assault *because* he understood

the witnesses to say that Pyatt fired the initial shot *at* Rhodes's car. Under the

precedents, evidence that the accused intentionally fired a shot at a car occupied

by another would be a sufficient basis for a jury to infer the specific intent to

cause injury and to find the accused guilty of aggravated assault. See <u>Howard</u>

<u>v. State</u>, 288 Ga. 741, 743 (1) (707 SE2d 80) (2011) ("Deliberately firing a gun

in the direction of another person constitutes aggravated assault." (Citations and

punctuation omitted)); <u>Tiller v. State</u>, 267 Ga. 888, 891 (4) (485 SE2d 720)

---

[15] No doubt, there is some danger that a jury might lend credence to an opinion about the ultimate issue offered by an experienced law enforcement officer. But here, when Detective Jackson offered the opinion in question, he seemed to take issue with the lawyers in the case — both the defense counsel *and* the prosecuting attorney — who had characterized the first shot as a "warning shot." That seems less worrisome.

[16] To the extent that Detective Jackson misled the jury about the law by drawing a clear distinction between a warning shot, on the one hand, and an aggravated assault, on the other — a warning shot, after all, can be an aggravated assault — he did so in a way that would have inured to Pyatt's benefit. Pyatt cannot complain about that.

(1997) (intentionally shooting into a house), overruled on other grounds, Dunagan v. State, 269 Ga. 590, 593 (2) (a), n. 3 (502 SE2d 726) (1998).

Even more important, we note that Pyatt's own counsel elicited substantially the same testimony on cross-examination:

> Q. I want to start with a statement by you at the beginning of your testimony that from the get-go you felt like Tremaine Pyatt was guilty of aggravated assault because when he fired that first shot from the parking lot of the Tap Room at the car as it was leaving that you felt like that was aggravated assault because he shot at the car.
> A. Well, you said guilty. I don't determine the guilt part.
> Q. All right. You charged him with aggravated assault based on that act?
> A. That is correct.
> Q. And that's the basis of the charge in this case?
> A. That is correct.

Trial counsel then confirmed that Detective Jackson had based his understanding of the initial shot on the statements of witnesses and that he had understood those witnesses to say that the first shot was fired "at the car." At that point, trial counsel confronted Detective Jackson with the testimony and statements of witnesses who indicated only that the initial shot was fired in the air or at nearby trees. This line of cross-examination is relevant to our inquiry into prejudice in several respects. First, the concern about opinions on the

26

ultimate issue is that they invade the province of the jury, see <u>Fordham</u>, 254 Ga. at 59 (4), but that concern is mitigated in this case by Detective Jackson's explicit concession on cross-examination that "I don't determine the guilt part," which refers to the responsibility of the jury to decide the ultimate issue. Second, the cross-examination called into question the basis for Detective Jackson's opinion, thereby reducing the likelihood that the jury would blindly accept that opinion. See <u>State v. Beavers</u>, 963 A2d 956, 978 (II) (Conn. 2009) (with respect to error in admitting opinion of arson investigator on ultimate issue, noting that "the defendant had ample opportunity to cross-examine McGurk about his investigation, and emphasized during summations that McGurk had classified the fire as intentional despite the existence of a National Fire Protection Association guideline cautioning investigators against drawing such conclusions in the absence of physical evidence of an incendiary fire"). Third, and most important, the cross-examination elicited substantially the same opinion — that Detective Jackson believed that the first shot amounted to aggravated assault — as the direct examination to which Pyatt now says his lawyer should have objected. Pyatt notably, however, does not contend that his lawyer cross-examined Detective Jackson in an unreasonable way. In these

27

circumstances, Pyatt was not prejudiced by testimony on direct examination to the extent that his own counsel reasonably brought out the same testimony on cross-examination. See Butler, 292 Ga. at 408-409 (3) (c). See also State v. Miller, 2012-Ohio-1263, at ¶ 61 (Ct. App. 2012) ("Taylor and Miller do not explain how they were prejudiced by the admission of Detective Sivert's ultimate issue testimony [that the defendants were gang members], given that Miller's counsel repeatedly asked other officers to identify the members of the gang to which the defendants belonged." (Citation omitted)).

Finally, we note the absence of any indication in the record that the prosecuting attorney made use of any improper testimony by Detective Jackson. To the contrary, the transcript shows quite clearly that Detective Jackson shared his opinion about the ultimate issue for the first time without any prompting from the prosecuting attorney; his opinion was not responsive to the question that the prosecuting attorney had posed. And although the closing arguments were not transcribed, Pyatt does not allege that the closing of the prosecuting attorney included a reference to the opinion of Detective Jackson. Cf. Sharp v. State, 286 Ga. 799, 804 (5) (692 SE2d 325) (2010). We note as well that, if Pyatt's lawyer had objected (as Pyatt says he should have done), the trial court

28

might well have responded with curative instructions, charging the jury that determining guilt, assessing the credibility of the evidence, resolving conflicts in the evidence, and weighing the evidence are tasks solely for the jury. Yet, the trial court gave precisely those sorts of instructions at the close of the case, soon after Detective Jackson testified. "The jury was thoroughly and definitively instructed that they were not bound by the opinion testimony of any witness but were by law the sole and exclusive judges of the credibility of the witnesses, and it was solely within their province to determine the outcome of the case." Nolton v. State, 196 Ga. App. 690, 692 (2) (396 SE2d 605) (1990) (finding any error in admitting ultimate issue testimony was harmless). See also Beavers, 963 A2d at 978-979 ("[T]he trial court emphasized during its charge that the experts' conclusions were not binding on the jury, which could disregard them either in whole or in part."); Franklin v. State, 869 A2d 327 (3) (Del. 2005) ("the trial court's instruction cured any possible prejudice stemming from the comments [on the ultimate issue] and rendered them harmless beyond a reasonable doubt" (footnotes omitted)). Likewise, to the extent that the opinion shared by Detective Jackson implied anything about the law of aggravated assault, the trial court charged the jury that it was the responsibility of the court to determine the law

29

that applied, instructed that the jury was to take the law as charged by the court, and gave the jury an accurate charge on the elements of aggravated assault.

On the peculiar facts of this case, we conclude that Pyatt has failed to show a reasonable probability that, if only his lawyer had objected to the opinion offered by Detective Jackson on direct examination about the first shot amounting to an aggravated assault, the outcome of the case would have been different.[17] As such, Pyatt has failed to show that he was prejudiced by the allegedly deficient performance of his lawyer. His claim that he was denied the effective assistance of counsel is unavailing.

Judgment affirmed. All the Justices concur, except Hines, P.J., Benham and Hunstein, JJ., who dissent.

---

[17] We note that, even if the failure to object had somehow prejudiced Pyatt with respect to the convictions arising from the first shot, that prejudice alone would not be enough to set aside his conviction for felony murder, which indisputably was based on the firing of different shots, separated in time from the first shot by a meaningful interval. To have his murder conviction set aside, Pyatt would have to demonstrate that the prejudice extended specifically to the felony murder.

S15A1734. PYATT v. THE STATE.

HINES, Presiding Justice, dissenting.

As I disagree with Division 6 (b) of the majority opinion, which affirms the denial of the motion for new trial on the asserted ground of ineffective assistance of counsel based upon the failure to object to the "ultimate issue" testimony of Detective Jackson, I must respectfully dissent.

Although the majority is willing to assume that the quoted testimony of Detective Jackson was improper, and that the failure to object to it was unreasonable, I have no hesitation in finding that it was deficient performance for trial counsel to fail to object to the cited portion of Detective Jackson's testimony; it was an impermissible comment on the ultimate issue of Pyatt's guilt regarding the charges of aggravated assault, and resulted in prejudice to Pyatt. For a witness to express an opinion at trial as to the commission of the charged crime clearly invades the province of the jury. *Fordham v. State*, 254 Ga. 59 (4) (325 SE2d 755) (1985). See also *Proctor v. State*, 235 Ga. 720, 725-726 (221 SE2d 556) (1975) (The trial court properly excluded an answer to the question "[w]hat charge did you make against the defendant?" as "the only

probative value of [the anticipated] response, is the witness' [sic] opinion at the time he obtained the warrant as to the nature of the appellant's criminal culpability. This was an ultimate issue for the jury.")

And, I cannot agree with the majority's suggestion that trial counsel allowed the testimony to pass without objection in furtherance of a reasonable trial strategy. See footnote 16 of the majority opinion. Rather, when asked during the hearing on the motion for new trial why he did not object, trial counsel testified that he had no strategic reason, but "just missed it." Although the majority notes that counsel's cross-examination of Detective Jackson addressed the conflicting versions of reports regarding Pyatt's initial gunshot, for counsel to call attention to these conflicts does not support a conclusion that counsel would welcome ultimate issue testimony from Detective Jackson, but comports with counsel's testimony that he "just missed" the fact of ultimate issue testimony. Compare *Vanstavern v. State*, 293 Ga. 123, 126-127 (3) (c) (744 SE2d 42) (2013), in which trial counsel asked during the cross-examination of the interrogating detective whether, at a certain point of the interrogation, charging the defendant with murder was "a foregone conclusion" as part of counsel's pursuit of a strategy of undermining the investigation and

2

demonstrating that the detectives summarily dismissed the defendant's version of events.

Further, my view of Detective Jackson's testimony on the ultimate issue is different from that of the majority. Although the majority focuses on excerpts of the testimony that suggest a conclusion on Detective Jackson's part that Pyatt's first shot constituted an assault because Pyatt shot "at" the car in which Rhodes was driving Broadnax and Perry away, a complete reading of the testimony shows that Detective Jackson took the witnesses' statements not to be that Pyatt fired "at" the car, but "toward" it, and specifically "over" it, although Detective Jackson would not "get into inches or feet" as to how far over the car the projectile passed. Thus, Detective Jackson told the jury that the act of shooting over the car constituted an assault, intruding on its role of determining whether an aggravated assault had been committed by attempting to cause a violent injury with a firearm.[1]

---

[1] As to aggravated assault, the jury was instructed that:

A person commits the offense of aggravated assault when that person assaults another with a deadly weapon. To constitute such an assault, actual injury to the alleged victim need not be shown. It is only necessary that the evidence show beyond a reasonable doubt that the defendant attempted to cause a violent injury to the alleged victim. The State must also prove as a material

3

As to prejudice, I do not agree with the statement in footnote 18 of the majority opinion that Detective Jackson's testimony that shooting over the car – characterized as a warning shot or not – inured to Pyatt's benefit; the jury was charged with determining whether Pyatt attempted to cause violent injury by that act, and Detective Jackson told the jury that he did.[2]

The majority further posits that if trial counsel had objected to Detective Jackson's testimony on the ultimate issue, the trial court might have responded with a curative instruction. But, this overlooks the fact that, faced with a proper objection, it would have been for the trial court's broad discretion to determine whether granting a mistrial would be essential to preserve Pyatt's right to a fair trial. *Sharpe v. State*, 286 Ga. 799, 803-804 (5) (692 SE2d 325) (2010). Thus,

---

element of aggravated assault, such as alleged in this case, that the assault was made with a deadly weapon that, when used offensively against a person, is likely to or actually does result in serious bodily injury. A firearm, when used as such, is a deadly weapon as a matter of law.

The jury was not instructed that an assault could be committed by an act that places another in reasonable apprehension of receiving a violent injury. See OCGA § 16-5-20 (a) (2).

[2] The indictment charged Pyatt with: Count (1) - the malice murder of Rhodes; Count (2) - the felony murder of Rhodes while in the commission of the crime of aggravated assault by shooting him with a firearm; Count (3) - the aggravated assault of Rhodes by making an assault upon his person with a handgun; Count (4) - the aggravated assault of Perry by making an assault upon her person with a handgun; and Count (5) - the aggravated assault of Broadnax by making an assault upon her person with a handgun.

the majority assumes that had counsel made the necessary objection, the trial court would have exercised its discretion to deny a mistrial, that the court would have nonetheless given proper curative instructions, and that these hypothetical curative instructions would have been adequate to remove from the jury's consideration the inadmissable ultimate issue testimony. In my view, these are simply too many speculative and vague actions for this Court to assume and rely upon in remedying the situation. Although the burden placed on one who claims that he was denied the effective assistance of trial counsel is a heavy one, *Black v. State*, 296 Ga. 658, 662 (2) (769 SE2d 898) (2015), I believe that it has been met here; there is a reasonable probability that the jury considered the improper testimony in its deliberation of all aggravated assault charges, including the fatal shooting. Id. What is more, the majority's hypothetical scenario makes the burden placed upon Pyatt not merely arduous, but insurmountable. In light of the direct relationship of Detective Jackson's testimony to the ultimate determination of guilt by the jury, I cannot conclude that it is highly probable that the improper evidence did not contribute to the jury's verdicts. See *McCartney v. State*, 262 Ga. 156, 159 (1) (414 SE2d 227) (1992), overruled on other grounds, *Linson v. State*, 287 Ga. 881, 886 (4) (700

SE2d 394) (2010). Compare *Bridges v. State*, 286 Ga. 535, 540 (5) (690 SE2d 136) (2010).

Further, I do not agree with the majority's conclusion that Detective Jackson's testimony regarding the ultimate issue went only to Pyatt's convictions for the aggravated assaults of Perry and Broadnax. See footnote 19 of the majority opinion. Because Detective Jackson testified that firing the gunshot over the car was an act of aggravated assault, and the fatal assault underlying the felony murder as alleged was based upon an act of firing the pistol in the direction of the car, the ultimate issue testimony also implicated the charge of felony murder based upon an aggravated assault upon Rhodes. Thus, Jackson's testimony "went to the very heart of the case," *Fordham*, supra, as to all the charges of which Pyatt was found guilty. As there is a reasonable probability that the jury considered the improper testimony in its deliberation of all aggravated assault charges, including the fatal shooting, Pyatt should be retried as to all charges.

I am authorized to state that Justice Benham and Justice Hunstein join in this dissent.