**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 25, 2018**

# In the Court of Appeals of Georgia

A18A0828. CROMER v. THE STATE.                    DO-028 C

DOYLE, Presiding Judge.

Following a jury trial, Tomdrick L. Cromer was convicted of armed robbery,[1] aggravated assault,[2] criminal trespass,[3] and possession of a firearm by a convicted felon during a felony[4] (two counts). He appeals from the denial of his motion for new trial, contending that (1) he received ineffective assistance of counsel, and (2) the trial

---

[1] OCGA § 16-8-41 (a).

[2] OCGA § 16-5-21 (a) (2).

[3] OCGA § 16-7-21 (a).

[4] OCGA § 16-11-133 (b) (1).

judge erred by failing to sua sponte recuse following an ex-parte communication with the State about his case.[5] Finding no reversible error, we affirm.

Construed in favor of the verdict,[6] the evidence shows that in December 2013, Cromer told his girlfriend, with whom he lived, that he was going out to get cigarettes and to see his friend, James Roney. With his girlfriend's permission, Cromer left in her black Ford F-150, telling her that he would have Roney work on the brakes in the truck.

Meanwhile, Curtis Smith was finishing up a night of bowling with his league. As Smith walked to his car in a covered parking area, he noticed two men walking through the parking area, momentarily losing sight of them until he saw one reappear, approaching him with a gun, saying, "Don't look at me. Turn around." The gunman ordered Smith to give him his phone and wallet, Smith complied, and then the gunman fled. The robbery was witnessed by at least two other league members, but none of them were able to visually identify the gunman. Two league members chased the gunman, who continued his flight while exchanging gunfire with one league

---

[5] Cromer initially enumerated a third error based on post-trial precedent in *Olds v. State*, 299 Ga. 65, 75-76 (786 SE2d 633) (2016), but he withdrew this enumeration in his reply brief.

[6] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

member who was armed. The witnesses saw the gunman get picked up by a black Ford F-150, which had been waiting nearby, idling with its lights off.

Police responded to the scene, and shortly thereafter, pulled over the black Ford F-150, which was on a road in the area and occupied by Cromer and Roney. The officer told them that he had stopped the vehicle because there had been an armed robbery involving a vehicle fitting the description of their truck. Roney replied that "he had actually driven to the area to see if he could help, because he had heard gunshots." The officer obtained consent to search the truck and discovered suspected cocaine in the console. The officer arrested Roney, found additional suspected cocaine in his pocket, and impounded the truck.

Continuing the investigation the next day, police discovered Smith's wallet under a car in a used car lot near the bowling alley. Underneath another car in the same lot, an officer found a discarded pistol and Smith's cell phone. The pistol was in a condition showing that it had been fired until the magazine was empty, with the slide locked back to the rear, exposing a portion of the barrel normally covered by the slide. Later analysis matched the pistol to the ballistics evidence from the scene of the shootout and matched a fingerprint on the pistol with Cromer. Cromer's fingerprint

also was found on an interior portion of the truck door inaccessible with the door shut.

Based on the police investigation, Cromer (jointly with Roney) was charged with multiple offenses arising from the robbery and shootout. Following a jury trial, Cromer was found guilty of committing armed robbery, aggravated assault, criminal trespass, and possession of a firearm by a convicted felon during a felony. Cromer unsuccessfully moved for a new trial, and he now appeals.

1. Cromer contends that he received ineffective assistance of counsel because his trial counsel failed to engage and call an expert to refute testimony by the State's witness that the fingerprint on the pistol was in a place that was only exposed after all of the ammunition was fired from the gun. We disagree.

> To establish that his trial counsel was constitutionally ineffective, [Cromer] was required to prove both deficient performance by counsel and resulting prejudice. To prove deficient performance, [Cromer] had to demonstrate that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. Because judicial scrutiny of counsel's performance must be highly deferential, the law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. To carry this burden, [Cromer] must show that no reasonable lawyer would have done what

4

his counsel did, or failed to do what his counsel did not do. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Even if a defendant can prove that his counsel's performance was deficient, he must also prove prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Rather, the defendant must demonstrate a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." In all, the burden of proving a denial of effective assistance of counsel is a heavy one.[7]

Turning to the facts in this case, Cromer admitted that the gun involved in the robbery belonged to him , and the State endeavored to show that the fingerprint found on the gun was not a leftover print from a time when the gun was in Cromer's possession apart from the robbery. The State called a witness who explained that the fingerprint on the pistol matching Cromer's could not have been a leftover print

---

[7] (Citations and punctuation omitted.) *Smith v. State*, 298 Ga. 406, 412 (3) (a) (782 SE2d 269) (2016), quoting *Strickland v. Washington*, 466 U. S. 668, 687, 694 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984).

because it was in a place only exposed when the slide was pulled or locked back, the pistol's slide would leave marks on the print during operation, and the heat from firing the weapon would destroy any leftover prints in that location. On appeal, Cromer argues that his trial counsel should have called an expert witness to refute this testimony and explain how that print might have survived multiple shots being fired.

At the motion for new trial hearing, Cromer's new counsel proffered expert testimony from a former firearm examiner at the Georgia Bureau of Investigation who opined that the fingerprint at issue "would [survive] the heat" generated by several shots being fired. But Cromer's proffered expert never examined the pistol used in this case and could not have addressed the fact that the slide would have marked or damaged the fingerprint had it been left prior to the shootout at the robbery. When Cromer's trial counsel was asked about his approach to challenging the State's expert testimony, trial counsel explained that he had hired a fingerprint expert to advise him on the case. Based on what trial counsel learned from the expert, including that the evidence "would . . . have some linkage there between the fingerprint and a possible person operating the gun," he decided for strategic reasons not to "run away" from the fingerprint evidence, instead pointing out that the fingerprint could have been from a different occasion.

6

It is well established that the decision as to which defense witnesses to call is a matter of trial strategy and tactics. In particular, the decision of how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.[8]

Based on the record before us, including testimony from Cromer's trial counsel about his strategic reasons for not calling an expert, we discern no basis for reversal.

2. Cromer next contends that his due process right to a fair trial was violated when the trial court failed to sua sponte recuse himself due to alleged ex-parte communications with the State revealing a bias against Cromer. We disagree.

At the motion for new trial hearing, which hearing was heard by a different superior court judge, Cromer presented evidence that after his conviction in this case, his trial counsel was contacted by another attorney who, while doing unrelated work, happened to encounter courtroom video depicting the trial judge in this case speaking

---

[8] (Punctuation omitted.) *Davis v. State*, 342 Ga. App. 889, 895-896 (2) (806 SE2d 3) (2017).

7

informally with the State's attorneys in open court about the schedule for the next week's trial (i.e., Cromer's trial). The following conversation ensued.

> Trial judge: Seventeen witnesses? Really?

> State: We may be able to cut it down a little bit.

> Trial judge: Nowadays it seems like more is better, unfortunately.

> State: The thin-to-win strategy is a preferable strategy at trial.

> [Brief mention of the presence of similar transaction evidence.]

> Trial judge: Well, hopefully this jury does the right thing. Had some unusual cases lately, unusual juries.

> State: Yeah, it's hard to get a fair shake in Cobb County.

> Trial judge: God, that was crazy. That one was crazy. . . . [T]he whole time I was saying you're putting too much evidence on, you're making a mountain out of a mole hill. I couldn't believe . . . they weren't going to convict on the [testimony from the] cop. I did not believe it on the EMT. I was really surprised by that. That was kind of . . . crazy.

Apart from this colloquy, Cromer points to no evidence of bias in the hearing of his case, including the conduct of trial and the sentencing by the trial court.[9]

Cromer contends that the above exchange, which occurred without the presence or knowledge of defense counsel, reveals the presence of actual bias against Cromer that deprived him of his right to a fair trial under the Due Process Clause.

> A trial judge generally ought not give advice to a lawyer about trial strategy in a case in which the judge is presiding. At least in some circumstances, the giving of such advice could create an appearance of partiality, which is a proper ground for a motion to recuse under our Code of Judicial Conduct. And for the purposes of this appeal, we will assume — without deciding — that the conversation in [open court] created such an appearance of partiality. But not every violation of the Code of Judicial Conduct implicates the constitutional guarantee of due process. . . . [T]he Due Process Clause demarks only the outer boundaries of judicial disqualifications, and generally speaking, the codes of judicial conduct provide more protection than due process requires. Accordingly, the constitutional standard for judicial disqualification is confined to rare instances. . . .
>
> [D]ue process is concerned with *actual* bias, and absent a showing of actual bias, due process requires recusal only in particular

---

[9] Cf. *Barnett v. State*, 300 Ga. 551, 555 (2) (796 SE2d 653) (2017) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.") (punctuation omitted).

circumstances in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. For instance, due process may require recusal when a judge has a direct pecuniary interest in the outcome of a case, when a judge has an indirect, but substantial, pecuniary interest in the outcome, when a judge has executive responsibilities for the finances of an organization with a direct pecuniary interest in the outcome, when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent, when a judge personally was responsible for the bringing of the charges to be tried, and when a judge has been so personally vilified by a party charged with contempt as to necessarily become embroiled in a running, bitter controversy with the contemnor.[10]

When determining whether there is a due process violation, a reviewing court looks at "whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias."[11]

Here, there is no allegation nor any evidence that the trial judge in this case had a personal or pecuniary interest in the case or any relationship to a party such that

---

[10] (Citations and punctuation omitted, emphasis in original.) *Pyatt v. State*, 298 Ga. 742, 751-752 (5) (784 SE2d 759) (2016).

[11] (Punctuation omitted.) *Williams v. Pennsylvania*, 579 U. S. __ , __ (II) (A) (136 SCt 1899, 195 LE2d 132) (2016).

Cromer's due process interest was implicated. With respect to the particular comments at issue, the better practice would be to avoid such discussions, particularly with attorneys appearing before the court. Nevertheless, the trial judge's comments essentially addressed certain witness testimony in an unrelated trial that already had concluded. Even if the judge's comments reflected his view on the credibility of a particular police officer's testimony in the unrelated trial, the comments did not amount to an opinion that all law enforcement testimony should be believed or that it should be believed in Cromer's case. Likewise, the comments about the jury doing the "right thing" did not state what the "correct" outcome should be with respect to any particular case, including Cromer's.

In sum, despite Cromer's well-made argument to the contrary, the record does not reveal an unacceptable risk of bias such that the average judge in this circumstance is not likely to be neutral.[12]

---

[12] See *Pyatt*, 298 Ga. at 749-753 (5). Cromer also argues that a new trial is necessary in light of *State v. Wakefield*, 324 Ga. App. 587 (751 SE2d 199) (2013), which affirmed the grant of new trials based on the discovery that the trial judge had engaged in an affair with a public defender who appeared before the judge. See id. at 594 (2) (c). *Wakefield* was based on the mandatory recusal standard in Canon 3 (E) of the Code of Judicial Conduct, which is implicated when a trial judge's impartiality might reasonably be questioned based on, e.g., a personal bias concerning a party or an attorney. In light of the stark difference between the conduct at issue in *Wakefield* and in this case, we find Cromer's argument unpersuasive.

11

*Judgment affirmed. Dillard, C. J., and Mercier, J., concur.*