294 Ga. 818
FINAL COPY

S13G0645. THE STATE v. HARGIS.

BLACKWELL, Justice.

Anthony Hargis was tried by a Union County jury, and he was convicted of several crimes relating to the unlawful manufacture of methamphetamine. Following the denial of his motion for new trial, Hargis appealed, asserting seven claims of error, including that the trial judge was disqualified by her receipt of an ex parte communication and, therefore, should have recused, and that the trial court erred when it denied a motion to suppress evidence of a similar transaction. In Hargis v. State, 319 Ga. App. 432 (735 SE2d 91) (2012), the Court of Appeals agreed that the trial judge should have recused, it agreed that the motion to suppress should have been granted, and it reversed the judgment of conviction upon these grounds without reaching the other claims of error. On the petition of the State, we granted a writ of certiorari to review the decision of the Court of Appeals, and we now conclude that the Court of Appeals erred with respect to both recusal and the motion to suppress.

Accordingly, we reverse the judgment of the Court of Appeals, and we remand for consideration of the remaining claims of error.

In September 2006, Hargis and Karen Taylor were indicted, and both were charged with a conspiracy to manufacture methamphetamine in a shed behind the home that they shared, criminal attempt to manufacture methamphetamine, and unlawful possession of ephedrine and pseudoephedrine. In addition, Hargis alone was charged with unlawful possession of false identification documents and forgery in the second degree. A trial was set for February 2009, and apparently around that time, Taylor met with her lawyer, Jeanne Davis. Also around that time, Taylor and Davis met with a prosecuting attorney. Unbeknownst to Davis and the prosecuting attorney, Taylor made audio recordings of these meetings with a recorder that Hargis had instructed her to use.

When the day set for trial arrived, Hargis failed to appear, and a bench warrant was issued for his arrest. A few months later, law enforcement officers received an anonymous tip that Hargis — still wanted for his failure to appear — had returned to the residence that he and Taylor previously had shared. Based on this tip, officers went to the residence on July 30, 2009, and although they

2

did not see Hargis at the home, they found a smoldering fire in the back of the home, fresh tire tracks, and a bottle containing an unknown liquid. The officers also spoke with neighbors, who said that Hargis had been "coming and going all day," and who described a beige truck that Hargis was driving. That afternoon, the officers observed a beige truck approach the residence and then suddenly speed away. The officers immediately began to search the area for the beige truck, and they soon found it, along with Hargis.

When the officers apprehended Hargis, they searched the beige truck. There, they found evidence that Hargis still was involved in the manufacture of methamphetamine, evidence that the State later would offer at trial as proof of a subsequent similar transaction. Based in part on the evidence found in the truck, officers also obtained and executed a search warrant for the residence that Hargis and Taylor had shared, and at the residence, they found methamphetamine and additional evidence of the manufacture of methamphetamine. Also in their search of the residence, officers found the audio recordings that Taylor had surreptitiously made of her conversations with Davis and the prosecuting attorney. These audio recordings were the subject of the ex parte communication by which the Court of Appeals found that the trial judge

3

was disqualified, and the evidence that Hargis — even as a fugitive — still was involved in the manufacture of methamphetamine was the subject of the pretrial motion to suppress that, according to the Court of Appeals, the trial court ought to have granted. We turn now to the claims of error upon which the Court of Appeals reversed the judgment of conviction.

1. We begin with the failure of the trial judge to recuse. Before trial, Hargis filed a motion to compel the State to produce the audio recordings, and the trial court set a hearing on his motion. In connection with the hearing, the prosecuting attorney made the recordings available to the trial judge for an in camera inspection. By this time, Davis no longer represented Taylor,[1] but Davis nevertheless approached the trial judge in chambers to discuss the recordings.[2] There, Davis apparently shared with the judge that she had some concerns about

---

[1] Following the continuance of the February 2009 trial for the failure of Hargis to appear, Taylor had retained another lawyer. At some later point in the proceedings, Davis briefly resumed her representation of Taylor. It is undisputed, however, that Davis did not represent Taylor around the time of the hearing on the motion to compel the production of the audio recordings.

[2] The record does not reflect exactly when Davis approached the judge, but the parties seem to agree that it was before trial and around the time of the hearing on the motion to compel.

the dissemination of the recordings. It appears that no one else — including Hargis and his counsel — attended this meeting.[3] Exactly what was said in this meeting is unknown, insofar as Davis later testified that she could not recall what was said, and no one asked the judge about the meeting. Davis did testify, however, that she had some concerns about her own safety at the time of the meeting — she was "leery" of Hargis, she explained, and she was worried about the prospect that Hargis might hear what had been said about him in her meetings with Taylor — and that she may have shared such concerns with the trial judge in their pretrial meeting.[4] Hargis was tried and convicted a few weeks

---

[3] Davis later could not recall whether the prosecuting attorney might have been present, but the prosecuting attorney stated unequivocally that she did not attend the meeting.

[4] When Davis later testified about her pretrial meeting with the judge, she said:

> I don't recall the specifics, I recall that I had concerns about, first of all, what was on the tape. Specifically, conversations that I might have had with Ms. Taylor. And also concerns about the tape and, you know, what might have been said about Mr. Hargis on the tape in terms of them being codefendants. That was the concern I had. And I was concerned about personal safety issues and things of that nature.
> . . .
> I considered Mr. Hargis to be somewhat — I've always been very leery about Mr. Hargis, danger kind of things, you know, just always somebody that I would probably watch my back with.
> . . .
> [I] [c]an't recall the specifics of the conversation, but I do recall that being a concern. It — I cannot recall specifically the conversation. I just remember being concerned about the contents of the tape, what I might have

after the hearing — his trial began on September 28, 2009, and the jury returned its verdict a week later — and it is undisputed that the trial judge never disclosed to Hargis before trial and on the record that she had met privately with Davis or that Davis spoke in that meeting of concerns about Hargis.[5]

Like the precise content of the ex parte communication, exactly when Hargis learned of it also is unclear. The record shows, however, that Hargis certainly knew of it by June 3, 2011, when he first raised the ex parte communication in an amended motion for new trial, asserting that the trial judge was disqualified by her receipt of the communication, that the trial judge should have recused before trial, and that Hargis, therefore, ought to have a new trial.[6]

---

said on the tape, what Ms. Taylor might have said on the tape, what Mr. Hargis might have heard on the tape and, you know, if that were to be played in open court or if Mr. Hargis were to hear it or something like that, there were some personal safety issues that I was concerned about.

The record indicates, however, that concerns about Hargis were not the only concerns that Davis had when she met privately with the judge. Davis also was concerned that the recordings contained privileged conversations with her client, and she may have been concerned as well that she had been recorded saying unkind things about the prosecuting attorney.

[5] It was disclosed to Hargis on the record that the trial court had met outside his presence with the prosecuting attorney and defense counsel concerning the audio recordings. Nothing was said in this disclosure, however, to suggest that the trial judge had met separately and privately with Davis.

[6] The record suggests that Hargis actually knew of the communication several months earlier. In his June 2011 amended motion for new trial, Hargis alleged not only that the trial

That same day, the trial court held a hearing on the motion for new trial, at which Davis testified about her meeting with the trial judge, and at which the same trial judge presided. But even then, Hargis never moved the trial judge to recuse, and he never voiced any objection to the same trial judge hearing and deciding his motion for new trial. Nor did he argue in his brief on the motion for new trial — which he filed a month after the hearing — that the trial judge ought to recuse from deciding his motion.[7] Noting that Hargis had filed no motion to recuse, the trial court denied his motion for new trial with respect to disqualification. The Court of Appeals concluded that the failure of the trial judge to recuse was error, but it never should have reached the merits of the recusal question.

judge should have recused, but also that his trial counsel was ineffective because trial counsel "failed to request the recusal of the [trial judge] upon discovering that discussions occurred about [Hargis's] case in the presence of . . . prior or current counsel for [Taylor] but without the presence of [Hargis] or counsel for [Hargis] and without notification to [Hargis] or counsel for [Hargis]." His trial counsel, however, had been removed from the case in December 2010, so the allegation that trial counsel discovered the ex parte communication must refer to some point in time before December 2010. Accordingly, Hargis's own pleadings suggest that his trial counsel knew of the ex parte communication by December 2010. Nevertheless, it is clear that Hargis knew of its content by June 2011, and we rest our decision on the fact that, even then, he filed no motion to recuse.

[7] By the way, the reader should know that the lawyers now representing Hargis in this Court did not represent him in connection with his motion for new trial. Hargis then was represented by another lawyer. His current lawyers appeared only after this Court granted the petition of the State for a writ of certiorari and his previous appellate counsel withdrew.

When a party learns of grounds for the potential disqualification of the judge, he must promptly move for the recusal of the judge, see Uniform Superior Court Rule 25.1,[8] and if he does not, the question of disqualification is not preserved for appellate review. In re Adams, 292 Ga. 617, 617 (1) (740 SE2d 134) (2013). See also Woodall v. State, 294 Ga. 624, 663 (9) (754 SE2d 335) (2014). Here, the record shows that Hargis *never* filed a motion to recuse, even after he had knowledge of the grounds for potential disqualification. Asserting a disqualification in a motion for new trial before the same judge who is alleged to be disqualified — without also asking the judge to recuse from hearing the motion for new trial — is not a proper means of raising and preserving the issue. See Christensen v. State, 245 Ga. App. 165, 172 (11) (537 SE2d 446) (2000) ("An extraordinary motion for new trial based upon newly discovered evidence is an improper vehicle to raise a motion to recuse; a motion

---

[8] Rule 25.1 provides:
    All motions to recuse or disqualify a judge presiding in a particular case or proceeding shall be timely filed in writing and all evidence thereon shall be presented by accompanying affidavit(s) which shall fully assert the facts upon which the motion is founded. Filing and presentation to the judge shall be not later than five (5) days after the affiant first learned of the alleged grounds for disqualification, and not later than ten (10) days prior to the hearing or trial which is the subject of recusal or disqualification, unless good cause be shown for failure to meet such time requirements. In no event shall the motion be allowed to delay the trial or proceeding.

8

to recuse can only be raised pursuant to [Uniform Superior Court Rule 25.1], which incorporates by rule approved by the Supreme Court the procedures to be followed in all cases of recusal.").[9]

Even after Hargis learned of the grounds for the potential disqualification of the trial judge, he apparently decided to take his chances with the same judge on his motion for new trial. That was his choice to make, but he could not do so and still preserve the disqualification issue for review in the appellate courts.[10] To hold otherwise would be to sanction gamesmanship. See, e.g., White v.

---

[9] In Hampton v. State, 289 Ga. 621, 625 (4) (713 SE2d 851) (2011), we assumed that a disqualification issue might properly be raised in a motion for new trial, but we noted that Christensen held otherwise. We decide today that raising a disqualification issue in a motion for new trial is not sufficient to preserve the issue, at least so long as the same judge — the one allegedly disqualified — is hearing the motion for new trial. If, by the time the grounds for disqualification are known, the allegedly disqualified judge no longer is presiding over the case, we suppose that it might be sufficient to raise the issue in a motion for new trial, inasmuch as a motion to recuse would serve no purpose in such a case. But this is not such a case.

[10] The Court of Appeals held that the alleged disqualification in this case could not be waived, acknowledging that, when a judge is disqualified under the disqualification standards in Canon 3 (E) of the Code of Judicial Conduct, the disqualification can be waived pursuant to Canon 3 (F). The Court of Appeals explained, however, that the trial judge here was disqualified under Canon 3 (B) (7), and no waiver appears in the Code for a disqualification under Canon 3 (B). The Court of Appeals misunderstood the Code in this respect. With certain exceptions, Canon 3 (B) (7) forbids a judge to initiate or consider an ex parte communication, but Canon 3 (B) (7) says nothing about disqualification. When a judge has taken part in an ex parte communication in violation of Canon 3 (B) (7), whether the violation requires the disqualification of the judge must be assessed under Canon 3 (E). And disqualification under Canon 3 (E) clearly can be waived.

9

National Football League, 585 F3d 1129, 1141 (II) (B) (8th Cir. 2009) ("A motion to recuse should not be withheld as a fallback position to be asserted only after an adverse ruling."); State v. Jenson, 440 NW2d 686, 688 (Neb. 1989) ("One cannot know of improper judicial conduct, gamble on a favorable result by remaining silent as to that conduct, and then complain that he or she guessed wrong and does not like the outcome."). Moreover, the requirement that a motion to recuse be filed promptly is intended to promote judicial economy, that is, to ensure that "long and costly proceeding[s]" before a disqualified judge are avoided. See Pope v. State, 257 Ga. 32, 35 (2) (b) (354 SE2d 429) (1987) (citation and punctuation omitted). See also LoCascio v. United States, 473 F3d 493, 497 (2d Cir. 2007) ("[A] prompt application [for recusal] affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take." (Citation and punctuation omitted)). The idea that a party could allow a judge whom the party believes to be disqualified to continue to preside over the case without objection, only later to urge the disqualification, is inconsistent with the principles of fair play and judicial economy that are embodied in the requirement that a motion to recuse be filed promptly. Accordingly, the claim

of disqualification in this case was not properly preserved for appellate review, and the Court of Appeals ought not have reached the merits of that claim.[11]

2. We turn now to the motion to suppress, which we will address in three parts.[12]

(a) As we noted earlier, the motion to suppress concerned evidence that was seized in connection with the apprehension of Hargis on July 30, 2009. When officers saw the beige truck approach the residence that Taylor and Hargis had shared and then speed away, they began to search the area for Hargis. Thinking that Hargis might try to cross into North Carolina, one officer began to drive toward the state line. Along the way, he saw the beige truck parked at

---

[11] About the merits, we decide nothing. We note, however, that Hargis failed to adduce any evidence in the trial court that the trial judge considered the ex parte communication in any way or that he otherwise was prejudiced by it. That said, we note that trial judges "must scrupulously avoid [improper] ex parte communications whether or not they consider them." Ivey v. Ivey, 264 Ga. 435, 438 (3) (445 SE2d 258) (1994). We note as well that "[a] trial judge has an ethical duty to recuse himself or herself sua sponte anytime the judge is aware of grounds to do so." Gude v. State, 289 Ga. 46, 50 (3) (709 SE2d 206) (2011). Our opinion should not be understood to sanction the way in which the trial judge dealt with the ex parte communication in this case. To the contrary, we hold only that Hargis — having decided to take his chances with the trial judge even after he learned of the ex parte communication — ought not be heard to complain about it.

[12] In the trial court, there was some dispute about the facts pertinent to the motion to suppress. On appeal, however, we must accept the findings of the trial court about questions of fact and credibility unless clearly erroneous, and so, we must view the evidence in the light most favorable to the factual findings of the trial court. Scott v. State, 316 Ga. App. 341, 341 (729 SE2d 481) (2012).

a convenience store, facing the road with its headlights lit. The officer then saw a man exit the convenience store and enter the truck, sitting in the driver's seat. Before the man drove away, the officer approached the truck, informed the man that law enforcement personnel were looking for the owner of a similar truck, and asked for his identification. The officer had seen Hargis before, and he believed that the man in the truck was, in fact, Hargis, but he wanted to confirm the identity of the man.[13] At that point, the man opened his wallet, and the officer observed that the wallet contained two photographic identification cards. The man refused, however, to show either identification card to the officer, and he also refused to give his name. The officer asked the man to exit the truck, and he did so, leaving the wallet in the driver's seat.

The officer then attempted to handcuff the man, but the man became increasingly belligerent and resisted the restraint. Eventually, the officer secured the man in handcuffs, although the man continued to struggle and later had to be put in leg shackles. After the man was secured, the officer reached into the truck, picked up the wallet, and removed the identification cards. One card was

---

[13] The officer later testified that the man in the truck had a wooly beard, but he otherwise looked like Hargis, whom the officer previously had seen clean-shaven.

a Tennessee driver's license, and it bore a photograph of Hargis, as well as his name. The other card was a forged Georgia driver's license, and it bore a photograph of Hargis, but the name of another. Having definitively identified the man in the truck as Hargis, the officer informed Hargis that he was under arrest, both on the outstanding warrant and for obstruction of a law enforcement officer. Hargis contends that it was unlawful for this officer to retrieve the identification cards from the wallet, and the Court of Appeals agreed, citing Arizona v. Gant, 556 U. S. 332 (129 SCt 1710, 173 LE2d 485) (2009), and reasoning that the officer had no authority to enter the truck and examine the wallet once Hargis had been handcuffed. 319 Ga. App. at 437 (3) (a). We disagree.

It long has been settled that, as an incident of a lawful arrest, an officer may search the person of the arrestee. See Maryland v. King, ___ U. S. ___ (IV) (A) (133 SCt 1958, 186 LE2d 1) (2013). See also Batton v. State, 260 Ga. 127, 130 (3) (391 SE2d 914) (1990). By the time the officer in this case directed Hargis to exit the truck, the officer had good reason to believe — based on his personal knowledge of Hargis — that the man in the truck was, in fact, Hargis. And the officer knew that Hargis was wanted on an outstanding warrant. As

13

such, the officer had authority at that point to arrest Hargis on the warrant.[14] See

Sweat v. State, 90 Ga. 315, 323 (17 SE 273) (1892). And the officer initiated the

arrest by directing Hargis to exit the truck, which was followed by his

handcuffing of Hargis. That the officer still wished to more definitively identify

Hargis, and that the officer did not tell Hargis until a few moments later that he

was under arrest, does not change the fact that Hargis was under arrest for the

purposes of the Fourth Amendment at the time that the officer directed him from

the truck and handcuffed him. See Sibron v. New York, 392 U. S. 40, 67 (V) (88

SCt 1889, 20 LE2d 917) (1968) (acknowledging that "a search incident to a

lawful arrest may not precede the arrest," but concluding that arrest preceded

search where officer "seized [arrestee] and curtailed his freedom of movement

on the basis of probable cause" prior to search). Accordingly, the officer was

permitted at that moment to search Hargis's person.

---

[14] The Court of Appeals held that the officer also had probable cause at that point to arrest Hargis for obstruction of a law enforcement officer, based on his failure to identify himself. 319 Ga. App. at 437 (3) (a). That might be so, see Hudson v. State, 135 Ga. App. 739, 742 (2) (218 SE2d 905) (1975), but we need not hang our decision on obstruction. The officer clearly had authority to arrest Hargis at that point on the outstanding warrant, which was the reason the officer approached Hargis in the first place.

The wallet, of course, was in the seat of the truck by the time that the officer got around to retrieving the identification cards from it. But Hargis had the wallet on his person when he first was approached by the officer, he held it as he interacted with the officer, and he put it in his seat only at or about the time the officer directed him to exit the truck, thereby initiating the arrest. In these circumstances, the wallet can fairly be considered as an effect on the person of the arrestee at the time of the arrest. See 3 W. LaFave, Search and Seizure § 5.5, p. 210, n. 1 (4th ed. 2004) ("[I]f the container was on the defendant's person at the time of arrest but he then removed it from his person and placed it nearby, the search of the container will still likely be treated as justified as part of the search of the person." (Citation omitted)). And as such, the officer could reasonably seize and examine it, especially considering that his purpose for doing so was to more definitively identify Hargis. See Illinois v. Lafayette, 462 U. S. 640, 646 (II) (103 SCt 2605, 77 LE2d 65) (1983) ("[I]nspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity." (Citation omitted)).

(b) An investigator arrived on the scene shortly, and after consulting with the arresting officer, the investigator looked into the truck and observed two

plastic pharmacy bags on the passenger seat in plain view. The investigator entered the truck, opened the bags, and found various items commonly used in the manufacture of methamphetamine, including brake cleaner, lighter fluid, and several pharmaceutical products with ephedrine. He then noticed a small, zippered, blue bag in the vicinity of the passenger seat, and he opened it as well. Inside, he found 15 more identification cards, all with the same photograph of Hargis, but each bearing a different name. During this time, Hargis was still present at the scene, although he had been secured in a patrol car. Hargis contends that, even if the arresting officer was justified in seizing the two identification cards from his wallet, the investigator had no authority to go into his truck again. Once more, we disagree.

After the arresting officer retrieved the identification cards from the wallet and saw that the cards both had photographs of Hargis but bore different names, the officer had probable cause to arrest Hargis not only upon the outstanding warrant, but also for unlawful possession of a false, fictitious, fraudulent, or altered identification document. See Brandt v. State, 314 Ga. App. 343, 346-347 (723 SE2d 733) (2012) (noting that officers may learn of additional grounds for search or seizure as investigation develops). The investigator also became aware

16

of the two identification cards when he arrived on the scene.[15] And under Gant, when an officer lawfully arrests the occupant or recent occupant of an automobile, and "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," the officer may search the passenger compartment of the vehicle for such evidence as an incident of the arrest. 556 U. S. at 343 (III) (citation and punctuation omitted). See also Hawkins v. State, 290 Ga. 785, 786 (723 SE2d 924) (2012). Before the investigator entered the truck to search the pharmacy bags, the investigator knew not only that Hargis had a false identification document, but also that Hargis was under indictment for crimes relating to the manufacture of methamphetamine, that Hargis had returned earlier that day to the location at which he previously had been involved in the manufacture of methamphetamine, that signs of recent activity had been observed at that location, that the bags in plain view were pharmacy bags, and that persons involved in the manufacture of methamphetamine often

---

[15] There is some dispute in the record about exactly how the investigator came to see the false identification card discovered by the arresting officer. There is some evidence that the arresting officer handed it over to the investigator. Other evidence suggests, however, that the arresting officer left the false identification card in plain view in the driver's seat, where the investigator saw it. We need not resolve the dispute in this appeal. Regardless of how he did so, it is clear that the investigator and arresting officer alike knew that Hargis had a false identification card.

use false identification documents to purchase items used in the manufacturing process from multiple pharmacies.[16] Having probable cause to arrest Hargis for possession of a false identification document, the investigator had reason to believe that evidence of *that* crime might be found in the vehicle in which Hargis had been arrested only minutes earlier.[17] Accordingly, under Gant, he was authorized to enter the vehicle to search the pharmacy bags. In the course of that search, he found the zippered bag, and he was authorized to open it as well, insofar as it was reasonable to believe that it too might contain evidence relevant to the crime. See Gant, 556 U. S. at 343 (III). See also Brandt, 314 Ga. App. at 346-347.

(c) After finding evidence in the truck suggesting that Hargis still was involved in the manufacture of methamphetamine, the officers secured a warrant to search the home that Hargis and Taylor previously had shared. There, they

---

[16] Federal and state law alike limit the quantity of substances containing ephedrine or pseudoephedrine that an individual may procure. See, e.g., 21 USC § 830 (d); OCGA § 16-13-30.3 (b) (1), (2).

[17] In particular, the investigator had reason to believe that items associated with the manufacture of methamphetamine would be found in the pharmacy bags, which would be evidence of a motive for Hargis to possess false identification documents. To prove the crime of unlawful possession of false identification documents, the State must, of course, prove that the possession was knowing, see OCGA § 16-9-4 (b) (1), and evidence of motive would tend to prove knowing possession.

found methamphetamine, other items associated with the manufacture of methamphetamine, and the recordings that were the subject of the ex parte communication. Hargis contends that the officers obtained the search warrant only by virtue of unlawful searches of his wallet and truck, and the items seized at the home are, therefore, "fruits of the poisonous tree." See generally Rashid v. State, 292 Ga. 414, 419 (4) (737 SE2d 692) (2013). But for reasons we have explained, the searches of the wallet and truck were not unreasonable. Accordingly, the search pursuant to warrant of the home was lawful. For all these reasons, the motion to suppress was properly denied by the trial court, and the Court of Appeals erred when it held otherwise.

Judgment reversed and case remanded. Thompson, C. J., Hines, P. J., Benham, Hunstein, Melton, JJ., and Judge Emory L. Palmer concur. Nahmias, J., disqualified.

Decided March 17, 2014.

Certiorari to the Court of Appeals of Georgia – 319 Ga. App. 432.

W. Jeffrey Langley, District Attorney, Cathy Ann Cox-Brakefield, Assistant District Attorney, for appellant.

19

Alston & Bird, Andrew J. Tuck, Kyle G. A. Wallace, Jonathan D. Parente, for appellee.