**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 9, 2019**

# In the Court of Appeals of Georgia

A19A0990. MILLER v. THE STATE.

DILLARD, Presiding Judge.

Following trial, a jury convicted Harold Miller of one count of theft by taking, four counts of aggravated assault, one count of aggravated battery, one count of reckless conduct, two counts of obstruction of a law-enforcement officer, one count of fleeing from a law-enforcement officer, and one count of theft by receiving. On appeal, Miller challenges the sufficiency of the evidence as to several of his convictions and further contends that the trial court erred in denying his claims of ineffective assistance of counsel. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that on October 3, 2014, Audrelia Harris and her mother drove to a repossession

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

impound lot in Forest Park to reclaim her vehicle, which had been taken there. After Harris paid the fee, an employee retrieved her vehicle from inside the fenced-in lot and parked it—with the engine still running—next to her mother's vehicle just outside the gate. And while Harris continued speaking to one of the impound lot's employees at a kiosk near the gate, her mother noticed a man—later identified as Miller—walking on the side of the road toward where she was parked. Then, upon reaching Harris's still-running vehicle, Miller jumped into the driver's seat and sped away while the mother yelled and honked the horn to alert her daughter and the impound employee of what was transpiring. Immediately, the owner of the impound lot and one of his employees jumped into the owner's tow truck and gave chase.

Within a few minutes, the two pursuers noticed that Miller had stopped at a red light, at which point, the owner blocked Miller's path with the tow truck. The employee then exited the truck and ran to the driver's side window of Harris's vehicle to confront Miller. But Miller immediately threw the vehicle into reverse, forcing the employee to jump onto the hood to avoid being hit. Miller then drove forward, swerved back and forth in order to throw the employee off the hood (which he quickly succeeded in doing), and then sped away. Subsequently, the owner drove his employee to a nearby fire station, where emergency medical technicians began

2

treating him for injuries to his elbow, knees, and back. And while there, the impound-lot owner contacted police and one of his other employees, who he then had use a computer program to track Harris's vehicle via a previously installed GPS tracker. With this assistance, police officers tracked the vehicle to a motel on Tara Boulevard, where Miller had apparently abandoned it.

Shortly thereafter, based on surveillance photos from security cameras at the impound lot and motel, as well as interviews with a few women who had been staying at another motel frequented by the man ultimately identified as Miller, a detective with the Forest Park Police Department determined that the suspect in the theft of Harris's vehicle went by the street nickname of "Bull" and was possibly named Harold Turner. Consequently, the detective obtained an arrest warrant for Harold Turner and passed the information, including a physical description, on to the Clayton County Sheriff's Office.

On October 10, 2014, one week after the theft of Harris's vehicle, a Clayton County sheriff's deputy received information from a confidential informant that Bull was at an abandoned house on Tara Road. So, at around 8:30 p.m. that evening, four uniformed deputies—driving in two separate marked vehicles—went to the house, intending to make an arrest. Approaching from two different directions, Deputies

Manning and Kearns parked just south of the house, while Deputies Hogan and Montford parked to the north. And given the time of night and the fact that the home was abandoned and had no lighting, the deputies were forced to use flashlights as they approached the house via two gravel driveways separated by approximately a few yards. Shortly after the deputies began their approach, Deputies Manning and Kearn saw a white male—who fit the description of Bull and was later identified as Miller—run toward the back of the property where a white van was parked. Deputy Manning yelled, "Sheriff's Office! Show me your hands!" But Miller, ignoring the deputy's command while looking straight at him, jumped into the driver's seat of the van and started the engine. Deputy Manning yelled at Miller to exit the vehicle, but instead, Miller began driving toward the two deputies, who drew their weapons and ducked behind a nearby tree as the van then veered past them to their right.

Meanwhile, separated from Deputies Manning and Kearns by only a few yards but in nearly complete darkness, Deputies Hogan and Montford heard Deputy Manning identify himself as a sheriff and order someone to stop but could not initially see to whom the order was directed. A moment later, they heard an engine revving up and tires screeching. As both Deputies Hogan and Montfort drew their weapons, they saw a white van accelerating directly toward them. Fearing he could

4

not fire his weapon without hitting Deputy Montford, who was slightly ahead of him, Deputy Hogan dove out of the way as the van bore down on them. But Deputy Montford fired several shots at Miller, with one hitting him, and then dove out of the van's way, avoiding being struck by mere inches. As the van sped off, the deputies notified dispatch that shots had been fired and issued a BOLO, before returning to their vehicles in an attempt to follow Miller.

A few miles away, Sergeant Arnzen—another Clayton County sheriff's deputy—was on patrol in a marked vehicle when he heard the dispatch that shots had been fired and the BOLO for the white van. And already aware that the deputies had planned to execute the arrest warrant for Bull at the Tara Road address that night, Sergeant Arnzen headed in that direction. Then, less than two miles away from the house, Sergeant Arnzen spotted a white van driving slowly and weaving. The van turned on a dead-end street and, upon reaching the cul-de-sac, drove into the yard of a home, nearly hitting the house before coming to a stop. As Sergeant Arnzen exited his patrol vehicle and approached the van, he noticed that the driver matched the description for Bull. Sergeant Arnzen then drew his weapon and loudly shouted, "Sheriff's Office! Stop the vehicle! Show me your hands!" Miller ignored the sergeant's commands and instead continued trying to drive through the yard until the

5

front end of the van pushed up against some tall shrubs. Sergeant Arnzen repeated his orders to stop the vehicle, but Miller again refused to comply, responding, "Fuck you, I'll hit you too." Miller then threw the van in reverse, at which point, Sergeant Arnzen holstered his weapon and dove into the van through the open driver's side window. He then shoved Miller over, and—with his legs hanging outside the window—forced the van's gearshift into park. Once the van stopped, Sergeant Arnzen climbed out of the vehicle, drew his weapon, and held Miller at gunpoint until the other deputies arrived.

Upon the arrival of backup, Sergeant Arnzen requested an ambulance in light of Miller's gunshot wound, and the ambulance then transported Miller to a local hospital. In the aftermath of Miller's arrest, he admitted that he was known as "Bull," but the deputies determined his identity was Harold Miller rather than Turner. The deputies also learned that the white van belonged to the owner of a local restaurant and had been stolen earlier that day when the owner's son left the keys in the ignition while unloading groceries.

Thereafter, the State charged Miller, via indictment, with one count of theft by taking (relating to the theft of Harris's vehicle), and one count each of aggravated assault, aggravated battery, and reckless conduct (all relating to the impound-lot

employee's attempt to thwart the theft of Harris's vehicle). In the same indictment, the State also charged Miller with two counts of obstruction of a law-enforcement officer, one count relating to his refusal to obey Deputy Manning's commands and the other relating to his refusal to obey Sergeant Arnzen's; five counts of aggravated assault upon a law-enforcement officer (relating to his attempts to hit each of the deputies with the van); one count of fleeing from a law-enforcement officer (relating to his refusal to obey Sergeant Arnzen's order to stop the van); and one count of theft by receiving (relating to the stolen white van).

The case ultimately proceeded to trial, during which the State submitted the evidence noted above. In addition, the State called as witnesses the two women who lived at the motel where Miller often stayed. Both women identified Miller as the person they knew by the nickname "Bull." And one of the women further testified that, shortly after the October 3, 2014 theft of Harris's vehicle, Miller bragged about stealing a car and someone trying to stop him by jumping onto the vehicle's hood. Then, at the conclusion of the trial, the jury found Miller guilty on the count of theft by taking, four counts of aggravated assault (specifically those relating to the impound employee, Deputies Montford and Hogan, and Sergeant Arnzen), the count of aggravated battery as to the impound-lot employee, the count of reckless conduct,

the two counts of obstruction of a law-enforcement officer, the count of fleeing from a law-enforcement officer, and the count of theft by receiving. The jury found Miller not guilty on the counts of aggravated assault as to Deputies Manning and Kearns.

Afterward, Miller obtained new counsel and filed a motion for new trial, in which he argued, *inter alia*, that his trial counsel rendered ineffective assistance. The State filed a response, and the trial court conducted a hearing on the motion, during which Miller's trial counsel testified. Not long thereafter, the court issued an order denying Miller's motion. This appeal follows.

1. In seven separate enumerations of error, Miller contends that the evidence was insufficient to support his convictions of aggravated assault upon Sergeant Arnzen and Deputies Montford and Hogan, obstruction of Sergeant Arnzen and Deputy Manning, fleeing from Sergeant Arnzen, and theft by receiving of the white van. In doing so, Miller concedes that he committed the acts alleged in the indictment but, nonetheless, maintains that the evidence was insufficient because the deputies and sergeant were not lawfully discharging their duties at the time he committed those acts. We disagree.

When a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption

of innocence.[2] And in evaluating the sufficiency of the evidence, we do not weigh the evidence or determine witness credibility, but "only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[3] Thus, the jury's verdict will be upheld so long as there is "some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[4] With these guiding principles in mind, we turn to Miller's specific claims concerning the sufficiency of the evidence supporting his convictions. And to do so, we will first address his contention that the officers who confronted him were not lawfully discharging their duties.

The Supreme Court of the United States has construed the Fourth Amendment to the United States Constitution[5] so as to set forth three tiers of police-citizen

---

[2] *See English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010) (noting that following conviction, an appellant no longer enjoys a presumption of innocence).

[3] *Jones v. State*, 318 Ga. App. 26, 29 (1) (733 SE2d 72) (2012) (punctuation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[4] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted); *accord Westbrooks v. State*, 309 Ga. App. 398, 399-400 (1) (710 SE2d 594) (2011).

[5] U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall

encounters:[6] "(1) communication between police and citizens involving no coercion or detention . . . , (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[7]

In first-tier encounters, police may "approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave."[8] But is well settled that a citizen's ability to "walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter."[9] In fact, even running from police during a first-tier encounter is "wholly

---

not be violated. . . ."); *see also* Ga. Const. art 1, § 1, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the person or things to be seized.").

[6] *Ewumi v. State*, 315 Ga. App. 656, 658 (1) (727 SE2d 257) (2012); *see State v. Walker*, 295 Ga. 888, 889 (764 SE2d 804) (2014) (noting that Fourth Amendment jurisprudence recognizes three tiers of police-citizen encounters).

[7] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889.

[8] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889.

[9] *Black v. State*, 281 Ga. App. 40, 44 (1) (635 SE2d 568) (2006) (punctuation omitted); *accord Johnson v. State*, 343 Ga. App. 310, 312 (807 SE2d 101) (2017).

permissible."[10] And, of course, an individual may "refuse to answer or ignore the request and go on his way if he chooses, for this does not amount to any type of restraint."[11]

In contrast, in a second-tier encounter—even in the absence of probable cause—a police officer may "stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity."[12] But importantly, in order to do so, the officer must "have more than a subjective, unparticularized suspicion or hunch."[13] Indeed, the officer's action must be "justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[14] Furthermore, the

---

[10] *Black*, 281 Ga. App. at 44 (1) (punctuation omitted); *accord Johnson*, 343 Ga. App. at 312.

[11] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889.

[12] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889-90.

[13] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

[14] *Ewumi*, 315 Ga. App. at 658-59 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

11

officer must have "some basis from which the court can determine that the detention was neither arbitrary nor harassing."[15]

Here, Miller contends that the evidence supporting his convictions was insufficient because the officers were not lawfully discharging their duties at the time of their confrontation. Specifically, he argues that when the officers encountered him at the abandoned home on Tara Road, they lacked any reasonable, articulable suspicion that he was involved in criminal activity. As a result, he concludes that this was a first-tier encounter from which he was free to leave, even run. Miller's argument is without merit.

On the night in question, the officers had an arrest warrant for a person known by the nickname Bull and reliable information that this person was currently at the abandoned Tara Road home. When they arrived, in uniform and marked patrol vehicles, they saw Miller, who generally fit the description of the warrant's subject, and, therefore, they were authorized in their attempt to detain him pending his identification.[16] And while Miller argues that detaining him was unreasonable

---

[15] *Ewumi*, 315 Ga. App. at 659 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

[16] *See State v. Hargis*, 294 Ga. 818, 824 (2) (a) (756 SE2d 529) (2014) (holding that officer's detention and subsequent arrest of defendant was lawful given officer's

12

because he did *not* match the description in the warrant, the description in the warrant was based on the witnesses' accounts of the theft from the impound lot, as well as surveillance photos. Thus, to the extent there were any inconsistencies in those descriptions, it was up the jury to resolve them.[17] Accordingly, Miller's contention that the evidence was insufficient to conclude that the officers lawfully discharged their duties lacks merit. And having so found, we now direct our attention to an analysis of the evidence supporting the specific convictions being challenged by Miller.

---

belief that defendant was the subject of an arrest warrant); *Francis v. State*, 345 Ga. App. 586, 589 (1) (814 SE2d 571) (2018) (holding that having encountered defendant almost immediately upon entering house, his seizure was authorized pending his identification and determination of whether he was the subject of arrest warrant); *Mauge v. State*, 279 Ga. App. 36, 38 (630 SE2d 174) (2006) (concluding that officers had probable cause to detain defendant until they could ascertain he was not the person named in the arrest warrant).

[17] *See Singleton v. State*, 324 Ga. App. 141, 143-44 (1) (749 SE2d 753) (2013) (holding that inconsistencies in a witness's description of a perpetrator are a matter for the jury). Although Miller does not explicitly challenge the validity of the warrant, even if he had, "[o]ur Supreme Court has held that probable cause to arrest arises once an arresting officer learns of the existence of an arrest warrant and that 'whether or not the information about the warrant later proves incorrect or invalid is immaterial.'" *State v. Lucas*, 332 Ga. App. 463, 465 (3) (773 SE2d 419) (2015), *citing Harvey v. State*, 266 Ga. 671, 672-73 (469 SE2d 176) (1996).

(a) *Aggravated assault on a law-enforcement officer*. Under OCGA § 16-5-21 (a) (2), a person commits the offense of aggravated assault when "he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" And OCGA § 16-5-20 (a) (1-2) provides that "[a] person commits the offense of simple assault when he or she either . . . [a]ttempts to commit a violent injury to the person of another; or . . . [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury."

In this matter, Counts 8, 9, and 12 of the indictment charged Miller with aggravated assault by alleging that he made an assault upon Sergeant Arnzen and Deputies Montford and Hogan, respectively, "with a motor vehicle, an object which when used offensively against a person is likely to result in serious bodily injury, by trying to hit said peace officer with said motor vehicle, while said peace officer was engaged in the performance of his official duties[.]" Indeed, the evidence shows that Miller drove the stolen white van directly toward Deputies Montford and Hogan when they attempted to detain him, only missing them when they dove out of the way. The evidence also shows that after driving the van into the yard of a residence and being ordered to stop by Sergeant Arnzen, Miller verbally threatened to "hit" Arnzen

14

and then attempted to reverse the direction of the van such that Arnzen believed that he intended to carry out his threat. Given these circumstances, the evidence was sufficient to support Miller's aggravated-assault convictions.[18]

(b) *Obstruction and fleeing*. Under OCGA § 16-10-24 (a), "[e]xcept as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." Somewhat related, OCGA § 40-6-395 (a) provides:

> It shall be unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer when given a visual or an audible signal to bring the vehicle to a stop. The signal given by the police officer may be by hand, voice, emergency light, or siren. The officer giving such signal shall be in uniform prominently displaying his

---

[18] *See Myers v. State*, 311 Ga. App. 668, 669-70 (1) (716 SE2d 772) (2011) (holding that evidence officer believed defendant's vehicle would hit him and stepped backward to avoid being hit was sufficient to support defendant's aggravated-assault conviction); *Young v. State*, 273 Ga. App. 151, 153 (1) (614 SE2d 257) (2005) (finding that evidence supported aggravated-assault conviction given officer's testimony that defendant tried to hit him with his vehicle after officer initiated a traffic stop); *Webb v. State*, 256 Ga. App. 653, 654 (1) (569 SE2d 596) (2002) (holding that "one who aims a motor vehicle at another person may be convicted of aggravated assault regardless of whether the victim sustained any injuries or was even touched by the vehicle").

15

or her badge of office, and his or her vehicle shall be appropriately marked showing it to be an official police vehicle.

Here, in Counts 5 and 11, the State charged Miller with obstruction of a law-enforcement officer by alleging that he "did knowingly and willfully obstruct" Deputy Manning and Sergeant Arnzen, respectively, "a law enforcement officer . . . in the lawful discharge of his official duties by refusing to stop fleeing when given verbal commands to do so by said law enforcement officer[,]" and "by refusing to show his hands when given verbal commands to do so by said law enforcement officer." Additionally, in Count 10, the State charged Miller with fleeing by alleging that he

> did willfully flee a pursuing police officer, after having been given a visual signal to bring his vehicle to a stop by [Sergeant] Arnzen, an officer who at the time of giving such signal was in a uniform prominently displaying the officer's badge of his office and the officer's vehicle was appropriately marked showing it to be an official police vehicle.

At trial, the evidence showed that both Deputy Manning and Sergeant Arnzen were in uniform and driving marked patrol vehicles when they ordered Miller to stop and he ignored those commands. Nevertheless, Miller argues that there was insufficient

evidence that the officers were lawfully discharging their duties by detaining him during a first-tier encounter. But as noted *supra*, the officers were justified in conducting, at the very least, a second-tier detention of Miller.[19] Consequently, Miller's ability "to withdraw from a consensual first tier encounter does not apply here."[20] Accordingly, the evidence sufficiently supported his convictions of obstruction[21] and fleeing.[22]

(c) *Theft by receiving*. Under OCGA § 16-8-7 (a), "[a] person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is

---

[19] *See supra* note 16 and accompanying text.

[20] *Prather v. State*, 279 Ga. App. 873, 876 (2) (633 SE2d 46) (2006).

[21] *See White v. State*, 310 Ga. App. 386, 390 (2) (b) (714 SE2d 31) (2011) (noting that because officers had probable cause to arrest defendant, evidence was sufficient to support allegation that officers lawfully discharged their duty and, thus, obstruction conviction); *Massey v. State*, 267 Ga. App. 482, 484 (600 SE2d 437) (2004) (holding that evidence supported obstruction conviction when defendant admitted resisting arrest but incorrectly claimed his arrest was unlawful).

[22] *See Sapp v. State*, 337 Ga. App. 14, 15-16 (785 SE2d 654) (2016) (holding that evidence defendant fled uniformed officer despite officer's commands he stop supported conviction for fleeing); *Lightsey v. State*, 302 Ga. App. 294, 294-95 (1) (690 SE2d 675) (2010) (holding that evidence defendant drove off after officers had ordered him to stop was sufficient to support conviction of fleeing a police officer).

17

received, disposed of, or retained with intent to restore it to the owner." And because of its very nature, the crime of theft by receiving is "one that is usually proved in whole or in part by circumstantial evidence."[23] Consequently, possession of recently stolen property, together with circumstantial evidence supporting an inference the defendant knew the property was stolen, will "sustain a conviction for this crime."[24]

In this matter, Count 13 of the indictment charged Miller with theft by receiving of the white van that he was driving when he encountered the sheriff's deputies. At trial, the evidence undisputedly demonstrated that the van had been stolen mere hours before Miller was observed by deputies driving it. Furthermore, when the deputies attempted to detain him outside the Tara Road house, Miller attempted to strike two of them with the van and then fled the scene in it. In addition, the State introduced other prior-acts evidence showing that, in 2008, Miller was arrested in Florida after leading police officers on a high-speed chase in a stolen

---

[23] *Lee v. State*, 320 Ga. App. 573, 577 (1) (c) (740 SE2d 307) (2013) (punctuation omitted); *accord Stacey v. State*, 292 Ga. 838, 840 (1) (b) (741 SE2d 881) (2013).

[24] *Lee*, 320 Ga. App. at 578 (1) (c) (punctuation omitted); *see Thornton v. State*, 292 Ga. 796, 797 (1) (b) (741 SE2d 641) (2013) (holding that knowledge to establish guilt for theft by receiving may be inferred from possession of recently-stolen property coupled with circumstantial evidence that would raise suspicion in ordinary prudent person).

truck. Given these circumstances, the evidence was sufficient to support an inference that Miller was aware that the van was stolen and, thus, his conviction of theft by receiving.[25]

2. Miller also contends that the trial court erred in denying his claims of ineffective assistance of counsel because his counsel failed to (1) secure the attendance of a defense witness, and (2) object to the trial court's sentence, which amounts to "cruel and unusual punishment" within the meaning of the United States and Georgia constitutions.[26] Again, we disagree.

---

[25] *See id.* at 577-78 (1) (c) (affirming defendant's theft-by-receiving conviction when evidence showed that defendant was driving stolen vehicle only 12 hours after it was stolen, attempted to flee from police in vehicle, and on a prior occasion had similarly fled police while driving a stolen vehicle); *Dawson v. State*, 271 Ga. App. 217, 218-19 (1) (609 SE2d 158) (2005) (holding that evidence that defendant possessed vehicle four days after it was stolen and fled when officers attempted to stop him, together with similar transaction evidence, was sufficient to authorize the jury to infer guilty knowledge and support theft-by-receiving conviction).

[26] U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*." (emphasis supplied)); *see also* Ga. Const., art. I, § 1, ¶ XVII ("Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*; nor shall any person be abused in being arrested, while under arrest, or in prison." (emphasis supplied)).

In order to evaluate Miller's claims of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*,[27] which requires Miller to show that his trial counsel's performance was "deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[28] In addition, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[29] In fact, the reasonableness of counsel's conduct is "examined from counsel's perspective at the time of trial and under the particular circumstances of the case[.]"[30] Importantly, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if "they were so patently unreasonable that no

---

[27] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[28] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012).

[29] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." (punctuation omitted)).

[30] *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016).

20

competent attorney would have followed such a course."[31] And unless clearly erroneous, this Court will "uphold a trial court's factual determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[32] Bearing this well-established analytical framework in mind, we will now consider Milller's specific claims of ineffective assistance of counsel.

(a) *Failure to ensure attendance of an allegedly exculpatory witness.* Just before the close of evidence, trial counsel informed the court that a defense witness named Barry Stevens would not be able to testify that day, as originally scheduled, because he was having difficulty getting to the courthouse. In light of this witness's absence, Miller's trial counsel requested a continuance but also informed the court that he was ready to proceed with closing arguments if necessary. The State objected to any continuance, and the trial court denied trial counsel's request. At the hearing on Miller's motion for new trial, trial counsel testified that he recalled interviewing

---

[31] *Id.*

[32] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014); *accord Duncan v. State*, 346 Ga. App. 777, 783 (2) (815 SE2d 294) (2018); *Howard v. State*, 340 Ga. App. 133, 139 (3) (796 SE2d 757) (2017).

Stevens and that he intended to call him to testify regarding the alleged identity of the person originally named in the warrant for Miller's arrest.

Miller now argues that his trial counsel performed deficiently by failing to secure Stevens's attendance at trial via a subpoena, which he claims would have allowed him to successfully request a continuance[33] when the witness failed to appear, and that Miller was prejudiced by this because Stevens would have testified that Miller was not the person described in the arrest warrant obtained after the theft of the vehicle from the impound lot. But as our Supreme Court has held, "[t]he decision as to which defense witnesses to call is a matter of trial strategy and tactics; tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances."[34] Furthermore, during the motion for new trial hearing, Miller failed

---

[33] *See Stevens v. State*, 261 Ga. App. 73, 74 (2) (581 SE2d 685) (2003) (noting that a defendant cannot complain of the trial court's failure to grant a continuance because of the absence of a witness, as he failed to subpoena the witness); OCGA § 17-8-25.

[34] *Dickens v. State*, 280 Ga. 320, 321 (2) (627 SE2d 587) (2006) (punctuation omitted); *accord Brooks v. State*, 323 Ga. App. 681, 684 (2) (747 SE2d 688) (2013); *Felder v. State*, 286 Ga. App. 271, 277 (5) (a) (648 SE2d 753) (2007); *see Hardin v. State*, 344 Ga. App. 378, 390 (3) (810 SE2d 602) (2018) ("The decision as to which witnesses to call is a matter of trial strategy within the exclusive purview of the attorney after consultation with the client.").

22

to actually show that Stevens's testimony would have been favorable to his defense or changed the outcome of the trial. Indeed, Stevens did not testify at the hearing, and his trial counsel's "testimony about what he thought [Stevens's] testimony might have been was mere speculation and hearsay."[35] And to show prejudice resulting from counsel's failure to call a witness, Miller "was required to offer more than mere speculation that the witness may have had evidence that would have assisted [his] case at trial."[36] Additionally, Miller cannot rely on his trial counsel's testimony about what Stevens might have said as it would be hearsay.[37] Again, as our Supreme Court has cautioned,

> [h]earsay evidence cannot be used either under the first *Strickland* prong
> to rebut the reasonableness of trial counsel's tactical decision or under

---

[35] *Felder*, 286 Ga. App. at 277 (5) (a); *accord Marshall v. State*, 324 Ga. App. 348, 349 (1) (b) (750 SE2d 418) (2013).

[36] *Dickens*, 280 Ga. at 322 (2) (punctuation omitted); *accord Felder*, 286 Ga. App. at 277 (5) (a).

[37] *See Dickens*, 280 Ga. at 322 (2) (noting that it would be hearsay for a defendant to use defense counsel's testimony about what an uncalled witness had been expected to say in order to establish the truth of that uncalled witness's testimony); *Dewberry v. State*, 271 Ga. 624, 625 (523 SE2d 26) (1999) (same); *Felder*, 286 Ga. App. at 277 (5) (a) (noting that a defendant cannot rely on testimony at hearing on motion for new trial about what an uncalled witness might have said in order to establish the truth of that uncalled witness's testimony as such would constitute hearsay).

the second *Strickland* prong to establish that the defense was prejudiced by counsel's deficient performance. Either the uncalled witness must testify or the defendant must introduce a legally recognized substitute for the uncalled witness's testimony.[38]

Thus, when, as here, "the defendant fails to proffer the testimony of an uncalled witness, he cannot prove that there is a reasonable probability that the trial would have ended differently."[39] Accordingly, the trial court did not err in denying Miller's claim of ineffective assistance in this regard.

(b) *Failure to challenge the constitutionality of the trial court's sentence*. At the conclusion of the sentencing hearing, the trial court imposed separate 20-year sentences as to each of Miller's four aggravated-assault convictions with each of the sentences to be served consecutively. As a result, the court imposed a prison sentence upon Miller totaling 100 years. Miller now argues that his trial counsel rendered ineffective assistance by failing to challenge this sentence as constituting cruel and

---

[38] *Dickens*, 280 Ga. at 322 (2) (punctuation omitted); *accord Felder*, 286 Ga. App. at 277-78 (5) (a).

[39] *McDaniel v. State*, 279 Ga. 801, 802 (2) (c) (621 SE2d 424) (2005) (punctuation omitted); *accord Felder*, 286 Ga. App. at 278 (5) (a); *see Hardin*, 344 Ga. App. at 390-91 (3) (holding that because defendant failed to proffer the testimony of his uncalled witness, he cannot prove that there was a reasonable probability the trial would have ended differently).

unusual punishment within the meaning of the United States and Georgia Constitutions and as an abuse of the trial court's sentencing discretion.

Importantly, Miller waived any direct constitutional challenge to his sentence by failing to raise such a challenge at the first opportunity (*i.e.*, the sentencing hearing),[40] which is what gives rise to his current assertion that trial counsel rendered ineffective assistance by failing to make such a challenge.[41] Turning to the statutes at issue, OCGA § 16-5-21 (b) provides: "Except as provided in subsections (c) through (k) of this Code section, a person convicted of the offense of aggravated assault shall be punished by imprisonment for not less than one nor more than 20 years." In addition, OCGA § 17-10-10 (a) provides that when "at one term of court a person is convicted on more than one indictment or accusation, or on more than one

---

[40] *See Jones v. State*, 290 Ga. 670, 673-74 (3) (725 SE2d 236) (2012) (noting that "a constitutional attack on a sentencing statute should normally be made no later than the sentencing hearing, at a time when corrective action is still possible" and that, because appellant "failed to raise his constitutional challenges at the first available opportunity during the sentencing hearing" and instead "first raised [them] in his amended motion for new trial," his challenges were untimely and not subject to review).

[41] *See id*. at 674 (3) (holding that, because appellant had waived review of constitutional challenge to sentencing statute by failing to raise it at the first opportunity, "the trial court correctly proceeded to examine whether [the appellant's] trial counsel was ineffective for failing to raise constitutional challenges to the sentencing statutes").

25

count thereof, and sentenced to imprisonment, the sentences shall be served concurrently unless otherwise expressly provided therein." And in interpreting this statute, the Supreme Court of Georgia has held that "[c]oextensive with their ability to impose a sentence that fits the crime, trial courts have great discretion in determining whether to run sentences concurrently or consecutively."[42] In fact, the discretionary assessment of punishment within legislatively prescribed boundaries has "long been ingrained and accepted in American jurisprudence, and OCGA § 17-10-10 (a) similarly frees a court to make a determination of whether to aggregate sentences."[43] Thus, our Supreme Court has held that within the law, there is "no limitation on this broad discretion that would preclude a trial court from running sentences partially concurrent and partially consecutive to one another."[44]

In this matter, the trial court imposed four separate 20-year sentences upon Miller for each of his four aggravated-assault convictions and ordered that those sentences be served consecutively. Miller argues that his trial counsel rendered

---

[42] *State v. Riggs*, 301 Ga. 63, 69 (2) (a) (799 SE2d 770) (2017).

[43] *Id.* (punctuation omitted); *accord Rooney v. State*, 287 Ga. 1, 3-4 (3) (690 SE2d 804) (2010).

[44] *Riggs*, 301 Ga. at 70 (2) (a).

ineffective assistance by failing to object to what amounted to a sentence of 100 years, which he characterizes as unconstitutionally cruel and unusual. But if the sentence falls within the statutory range of punishment set by the General Assembly,

> the presumption is that the sentence does not violate the Eighth Amendment, and the presumption remains until a defendant sets forth a factual predicate showing that such legislatively authorized punishment was so overly severe or excessive in proportion to the offense as to shock the conscience.[45]

Here, it is undisputed that the 20-year sentence for each separate aggravated assault falls within the statutory range.[46] And Miller has failed to demonstrate that this punishment was so excessive in proportion to the offenses as to shock the conscience. Indeed, the evidence showed that Miller stole a vehicle and then used that vehicle to assault a person attempting to thwart that theft. Then, a week later, Miller—driving yet another stolen vehicle—nearly struck three separate law-enforcement officers, who were attempting to arrest him. And while it is undeniable that the trial court lengthened Miller's cumulative imprisonment by imposing consecutive sentences,

---

[45] *Grier v. State*, 339 Ga. App. 778, 789 (6) (792 SE2d 737) (2016) (punctuation omitted).

[46] *See* OCGA § 16-5-21 (b).

"there is no constitutionally cognizable right to concurrent, rather than consecutive, sentences."[47] Accordingly, Miller has failed to show either deficient performance by trial counsel or a reasonable probability that the outcome would have been different if the constitutional challenge to his sentence had been timely raised, and his ineffective assistance claim is, therefore, without merit.[48]

For all these reasons, we affirm Miller's convictions and the denial of his motion for new trial.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

[47] *Rooney*, 287 Ga. at 6 (3) (punctuation omitted); *accord Osborne v. State*, 318 Ga. App. 339, 342 (2) (734 SE2d 59) (2012); *see Simpson v. State*, 310 Ga. App. 63, 64 (715 SE2d 675) (2011) (holding that because defendant's sentence for several robberies was with the statutory range and because the law allows separate and consecutive punishment for separate criminal transactions, the trial court did not err in denying defendant's motion to set aside a void sentence).

[48] *See Jones*, 290 Ga. at 676 (3) (holding that defendant failed to establish that he received ineffective assistance of counsel by counsel's failure to challenge sentence as equating to cruel and unusual punishment); *Pepe-Frazier v. State*, 331 Ga. App. 263, 273-74 (3) (c) (770 SE2d 654) (2015) (same).